420

Procter & Gamble Distributing Company, Respondent, *v.* Lawrence American Field Warehousing Corp., Formerly Known as American Express Field Warehousing Corporation, Appellant.

Garnac Grain Co., Inc., Respondent-Appellant, *v.* Lawrence American Field Warehousing Corp., Appellant.

A. J. Armstrong Co., Inc., Respondent-Appellant, *v.* Lawrence American Field Warehousing Corp., Appellant.

National Dairy Products Corporation, Respondent-Appellant, *v.* Lawrence American Field Warehousing Corp., Appellant.

Continental Grain Company, Respondent-Appellant, *v.* Lawrence American Field Warehousing Corp., Appellant.

J. R. Williston & Beane, Incorporated, et al., Respondents-Appellants, *v.* Lawrence American Field Warehousing Corp., Appellant.

In Each of the Above-entitled Actions: Lawrence American Field Warehousing Corp., Defendant-Appellant and Third-Party Plaintiff, *v.* Brooks Banker, as Treasurer of American Express Company, Third-Party Defendant-Appellant.

First Department, January 26, 1965.

*James M. FitzSimons* of counsel (*James B. Donovan* with him on the brief; *Watters & Donovan,* attorneys), for Lawrence American Field Warehousing Corp., appellant.

*William W. Owens* of counsel (*Peter J. O'Shea, Jr.,* with him on the brief; *Royall, Koegel & Rogers,* attorneys), for Procter & Gamble Distributing Company, respondent.

*Allen T. Klots* of counsel (*Peter H. Kaminer* with him on the brief; *Winthrop, Stimson, Putnam & Roberts,* attorneys), for Brooks Banker, third-party defendant-appellant.

*Sheldon Oliensis* of counsel (*Ivan Serchuk* with him on the brief; *Kaye, Scholer, Fierman, Hays & Handler,* attorneys), for A. J. Armstrong Co., Inc., respondent-appellant.

*Henry E. Otto* of counsel (*Samuel C. Otto* with him on the brief; *Otto & Easterday,* attorneys), for Garnac Grain Co., Inc., respondent-appellant.

*Robert MacCrate* of counsel (*David A. Donohoe* with him on the brief; *Sullivan & Cromwell,* attorneys), for National Dairy Products Corporation, respondent-appellant.

*Lloyd K. Garrison* of counsel (*Arthur L. Liman* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Continental Grain Company, respondent-appellant.

*Donald Marks* of counsel (*Stephen F. Selig* with him on the brief; *Baer, Marks, Friedman & Berliner,* attorneys), for J. R. Williston & Beane, Incorporated, and another, respondents-appellants.

BREITEL, J. P. These are appeals arising in six actions brought to recover damages on the dishonor of nonnegotiable warehouse receipts. The receipts had been issued in connection with the deposit by the several plaintiffs or their predecessors in interest of quantities of soybean oil. There are common issues arising from the unexplained disappearance of the oil from the warehouse tanks in which they had been stored.

Appeals were taken from six orders rendered by two different Justices at Special Term. All but one of the orders granted summary judgment to the plaintiff under CPLR 3212. With respect to all but one of the orders granting summary judgment there are cross appeals from the denial of full summary judgment for the stated value of the receipts. The sixth order, not involving the merits, concerns the consolidation and severance of the actions under CPLR 602, 603, 1010, 3212 (subd. [e]). The propriety of that order is dependent upon the outcome of the appeals involving the merits in which summary judgments were rendered. A separate opinion, *Per Curiam,* rendered simultaneously with this is dispositive of that appeal (*Armstrong Co.* v. *Lawrence Amer. Field Warehousing Corp.,* 22 A D 2d 436). This opinion is concerned with the five remaining orders, involving the substantive claims in the six cases.

There is no dispute that the soybean oil disappeared under circumstances which have never been explained. It is not even known when the oil disappeared, or for that matter, whether all the oil ever existed or was actually delivered into the possession of the issuer of the receipts. It is concluded that plaintiffs as owners of interests in or holders of the receipts are entitled to summary judgment, it being immaterial whether the warehouse receipts were improperly issued because the deposits never took place or the bailees are unable to explain the disappearance of the oil for which it had properly issued receipts.

It is also concluded that the first bailee, Lawrence American Field Warehousing Corp., is not discharged of its primary responsibility under the warehouse receipts by reason of the transferred custody of the oil to the second bailee, American Express Warehousing, Ltd. On any view, even if the transferred custody to the second bailee, Limited, was authorized or subsequently ratified by the receipt holders or their successors in interest there is no evidence of an actual novation by which the first bailee, Field, would be discharged of its primary responsibilities. At best there was only the addition of another obligor, the second bailee, to which the first bailee delegated its responsibilities.

On the other hand, it is also concluded, for reasons to be discussed, that assessments for damages are required in each of the cases. This is because in the present state of the proof on summary judgment motion plaintiffs may recover only their actual losses at the time of Field's failure to comply with their several demands, rather than the stated value of the warehouse receipts or the market value of the quantities of oil stipulated in such receipts, so long as they are unable to show that the

oil was actually delivered in bailment and was thereafter removed unlawfully.

Plaintiffs are holders of interests in the dishonored warehouse receipts. Their interests were acquired either as original depositors or as holders of divers security and property interests in the oil, whether by assignment, the issuance of delivery orders, or otherwise. Defendant Field is the original issuer of the receipts. Subsequent to issuance of the receipts, it transferred all its oil warehousing business, and the purported deposits of oil in suit, to the second bailee, Limited. The dishonoring of the receipts occurred subsequent to such transfer.

American Express Company was brought in under CPLR 1007 as the third-party defendant in each of the six actions. Prior to May, 1963 Field had been a wholly-owned subsidiary of Express under the name of American Express Field Warehousing Corporation. The corporation (by transfer of its corporate stock) and the bulk of its assets were then sold to the Lawrence Warehouse Company, after which Field assumed its present name. It is upon this sale and under the agreement made by the parent corporation, Express, that its liability as a third-party defendant to defendant Field is predicated. Excepted from the sale had been field warehousing business associated with the Allied Crude Vegetable Oil Refining Corp. It was this excepted business which was transferred, at the time of the sale, to the newly created subsidiary of Express known as American Express Warehousing, Ltd., the bankrupt second bailee above mentioned.

All of the dishonored receipts concern deposits of soybean oil delivered or purportedly delivered at the premises of Allied on which the field warehousing operations were conducted successively by the first and second bailees as wholly-owned subsidiaries of Express. When, in the Fall of 1963, Allied became notoriously insolvent and then a bankrupt, it was discovered that it had been the vortex of frauds and the unexplained nonexistence or disappearance of huge quantities of edible oils for which warehouse receipts had been issued to others. In due course, Limited, the second bailee, also became a bankrupt. The present actions were initiated by the holders against Field, the first bailee, which thereafter brought in Express as a third-party defendant. For reasons readily apparent, on these appeals involving summary judgment granted to plaintiff holders, Express and Field are joined in resisting such judgments. The bankrupt second bailee, Limited, is not a party to the actions or the appeals.

While the Allied collapse involved the unexplained disappearance of 1.6 billion pounds of edible oils, the six actions relate but to 95,233,792 pounds. The aggregate stated value of the receipts in the six actions is as follows:

Procter & Gamble Distr. Co. ............ $1,013,075.12
Garnac Grain Co. .................... 1,846,537.50
A. J. Armstrong Co., Inc. .............. 1,647,950.00
National Dairy Prods. Corp. ............ 1,358,628.66
Continental Grain Co. .................. 2,269,903.28 [1]
J. R. Williston & Beane, Inc. ............ 1,684,580.00

$9,820,674.56

Of these only Procter & Gamble and National Dairy were direct shippers for which they received nonnegotiable warehouse receipts from Field. The others (including J. R. Williston & Beane in association with an Illinois bank) received their interests in the oil and in the receipts as collateral security in financing transactions.

Field warehousing is a device whereby in juxtaposition to the premises of a trader or processor commodities may be stored by a warehouse company against receipts. In that way, as the trader or processor requires the stored commodities, it may obtain them by surrender of the receipts, and if nonnegotiable, by the giving of proper delivery orders. At the same time, by virtue of the issuance of the receipts by an independent warehouseman, the seller or financing company may hold the receipts or delivery orders pending payment by the trader or processor. To obtain the receipts, or delivery orders from the holders of the receipts, the trader or processor must make payments for whatever advances the receipts had been given as collateral security. The key to the device is the responsibility of the warehouseman and the integrity of its receipts, and also, regardless of the standing of the trader or processor, the interposition of the warehouseman in control and possession of the stored commodity to the exclusion of the trader or processor (cf. Uniform Commercial Code, §§ 7–205, 2–402, subd. [2]).

As noted earlier, prior to May, 1963 Field, then a wholly-owned subsidiary of American Express Company and bearing its public identification with Express in its name, certified by the receipts it had issued to plaintiffs or their predecessors in interest, that it had received various quantities of oil at the

---

1. This is the figure reflected in the pleadings and briefing. Independent calculation suggests that the correct figure may be no more than $2,177,440.70.

stated values mentioned above, and that it would hold such oil safely and securely, pending tender and surrender of the receipts or delivery orders and accumulated warehousing charges. The receipts authorized mingling of the fungibles. In May, 1963 Field transferred the entire Field warehousing business at Bayonne, N. J., to Limited, the newly created subsidiary of Express, also bearing in its name identification with Express. The name of Field was then changed to identify its ownership by the new parent corporation, Lawrence Warehouse Company.

When Field transferred its custody of the oil to Limited, Limited notified each of the holders of receipts or interests in the receipts that the custody of the oil had been transferred and advised further that in due time Limited would exchange its receipts for the Field receipts. None of the holders registered any objection and, indeed, at subsequent times, demanded of and received from Limited quantities of oil deposited under Field receipts and, of course, not now involved in these actions. On the other hand, Limited never tendered any exchange of the receipts, and no holder ever surrendered any.

It is this transferred custody of the oil which the holders urge was a conversion of the oil, because, they say, an unauthorized transfer of bailed property is a conversion as against the one entitled to the immediate possession. It is argued that Field was guilty of a conversion of the oil at such time, as a matter of law, without more.

It is true, of course, that generally the unauthorized transfer of bailed property, for whatever purpose even for a temporary period, is a conversion (e.g., *Laverty* v. *Snethen*, 68 N. Y. 522, 524–527; see 10 N. Y. Jur., Conversion, § 39). But such an act may be ratified (*Rathbun* v. *Citizens' Steamboat Co.*, 76 N. Y. 376). It is also true, however, under the general rule that where delivery is made to a third party for the accomplishment of the bailment purpose with the knowledge or implied consent of the bailor, there is no conversion (Bailment — Delivery to Third Person, Ann. 174 A. L. R. 1436, 1437).

The silence of the holders in these actions suggests that they acquiesced in the transfer, as well they might have, in view of Express' successive interest and control of the new subsidiary, provided, of course, there was no impairment of the responsibility of the first obligor. At best this silence would establish a waiver of the right to claim a conversion, but not reach far enough to establish a novation or a discharge of the primary obligor, the first bailee. Certainly, if this silence or failure to object did not amount to acquiescence as a matter of law, it at least created an issue of fact precluding a summary disposition

without trial. Consequently, the holders are not entitled to summary judgment on this score.

Defendants argue, on the other hand, that the transfer constituted a novation, discharging Field from all legal responsibility and substituting the now bankrupt Limited in its place. As held at Special Term by Mr. Justice LORETO and Mr. Justice STREIT, there is no evidence of a novation, assuming even for this purpose that there was a consent to the transfer or a subsequent ratification. Indeed, the consent and acquiescence in the transfer would be understandable if, but only if, Field remained primarily responsible. In such circumstances there was little to which the holders would have practical ground for objection. Consequently, there would be required evidence of some affirmative conduct or other circumstances from which there might be found express or implied consent to a novation. Perhaps, if there had been an exchange of receipts, that might have been an additional fact from which a novation might have been made out, sufficient to create a triable issue, but not to establish a defense for Field, as a matter of law. But there was no such exchange.

It is rather elementary law that the delegation of a responsibility to another does not, *ipso facto,* discharge the obligation of the first obligor (e.g., *Rochester Lantern Co.* v. *Stiles & Parker Press Co.,* 135 N. Y. 209, 216–217; Restatement, Contracts, § 160, esp. subd. [4]; cf. *id.,* § 165). At best, the new obligation makes the obligee an intended beneficiary under the new arrangement (Restatement, Contracts, § 136). The intention to discharge the old obligation and the substitution for it of the new must be established by something more than the simple act of delegation, notice to the obligee, failure of the obligee to object, and even acceptance of part performance from the new obligor.

The fact that the holders took some deliveries from the second bailee is quite immaterial, at least in the absence of a communicated repudiation of obligation by the first bailee (Restatement, Contracts, § 165, *supra*). They knew, of course, where the oil was and who was in direct custody, and had never objected. This supports no inference of novation, albeit it might supply a single fact relevant to a claim of ratification of the transferred custody. This alone or with other facts might suffice to raise an issue of fact whether there was a waiver or ratification of a possible conversion by such transferred custody, but this issue is not dispositive of the right to summary judgment although, as observed later, it is relevant on the measure of damages.

Plaintiffs then argue that if there was no novation discharging defendant Field, and even if the transferred custody of the oil did not constitute a conversion of the oil as a matter of law, then the failure by defendant Field to account for the oil or to deliver the oil on demand was a conversion, without more, precluding any triable issue. There is insufficient to establish conversion of the oil by removal subsequent to bailment. Since the disappearance of the oil is wholly unexplained, there is no knowing whether there had been a conversion of property actually bailed or there had been an issuance of receipts against nonexistent commodities. It is at this point that Field and Express make the salient point that just as there is no way of knowing in this mysterious complex of events when any oil was removed, so there is no way of knowing whether any or all the oil was actually deposited with Field in the tanks at Bayonne, N. J. True, there is no doubt that such oil was delivered to Bayonne, N. J., at least with respect to the direct shippers, Procter & Gamble and National Dairy; but whether the oil entered the warehouseman's tanks or custody is another matter. In the light of the general mystery it is not particularly significant that Field subsequently issued inventories showing possession of the oil. Such inventories are no more reliable than the receipts themselves; they simply provide book records and statements with respect to quantities of oil for which receipts were outstanding, but so did the receipts to begin with. These were not physical inventories but, in effect, transcripts, from unverified book entries, at least so far as one can tell. Mr. Justice LORETO at Special Term placed great stress on these subsequent inventories in granting summary judgment to Procter & Gamble, but it is preferable to give defendants the benefit of the doubt in precluding issues of fact.

Subdivision (2) of section 7–207 of the Uniform Commercial Code does in some situations change the prior law by giving to certain holders of "overissued" receipts for a portion of a fungible mass the rights of a holder who has made a delivery of existing goods to the warehouseman. Thus the holder of an overissued receipt may obtain a proprietary interest in bailed fungibles of another even though the receipt was not originally issued for the deposit of actual oil (McKinney's Cons. Laws of N. Y., Book 62½, Uniform Commercial Code, § 7–207, N. Y. Ann.). If this provision be applicable, then the holders of overissued receipts for nonexisting oil would be owners of a prorata share of existing oil and entitled to sue in conversion for the wrongful failure to deliver that share on demand. However, by its own terms this provision of subdivision (2) of

section 7–207 benefits only those holders to whom overissued receipts have been "duly negotiated", and therefore would not seem to apply to nonnegotiable receipts (Uniform Commercial Code, § 7–501).

It is true, as defendants argue, that a bailee is not an insurer. Thus, if despite the exercise of due care, there is an inability to deliver, the bailee is not liable to the one entitled to possession of bailed goods. Consequently, the matter of due care requires consideration before the issues in these cases can be determined.

Thus far the legal issues have been discussed in the light of the applicable New York rules. In truth the rules in New Jersey and New York are the same, largely because the matters arise in a commercial context in which there is little or no diversity among the States. The parties have also briefed the legal issues on this presupposition. With respect to the warehouseman's duty of care there is no reason to depart from this approach. While undoubtedly New Jersey law is applicable to the bailments, the New York rules are not different. In New Jersey the Uniform Commercial Code was in effect at the time of the transactions in suit. In New York the Uniform Warehouse Receipts Act was in effect (General Business Law, art. 9, §§ 90–143). Since then, the Uniform Commercial Code was adopted in New York, effective September 27, 1964. For all practical purposes insofar as the issues in these cases are involved the result is the same.

With the foregoing prefatory comment it is appropriate to consider the obligation of the warehouseman to exercise care. He has not only the obligation to exercise care, but concededly he has the burden of explanation for any loss or disappearance of the property bailed. He is also liable for damages arising from the improper issuance of receipts or documents of title. (Uniform Commercial Code, §§ 7–203, 7–204, 7–403; N. J. Stat. A., §§ 12A:7–203, 12A:7–204, 12A:7–403, 12A:10–106, eff. Jan. 1, 1963; General Business Law, §§ 95, 97, 106, 107, repealed effective Sept. 27, 1964.)

The primary fact is that the bailees did not deliver oil on demand, and they have no explanation for its nonexistence or disappearance. They would, however, show that the disappearance occurred despite the exercise of due care. In this respect they offer evidence that oil levels in the tanks were regularly inspected by teams of men representing Allied and Field (later Limited), and that the actual measurement was by the Allied representative while being observed by the Field or Limited representative. There was inadequate proof offered as to the precautions taken in the issuance of receipts or the

control of the valves and pipelines to and from the tanks controlled by the bailees or with tanks not controlled by the bailees and also located on the tank farm, as it was called, on the Allied premises.

Defendants make some showing that the records of Field were turned over to Limited in May, 1963 and that since the bankruptcy of Limited they remain in the control of the Federal court. What these records show or whether effort was made to obtain access to the records is not developed, nor is it all clear or likely that the records would show any more than the receipts what happened to the inventoried oil, assuming it ever existed.

There is also suggestion in the record, only lightly touched upon in the briefs, that forged receipts may be involved. However, plaintiffs rely upon reproduced receipts in each instance, and no issue as to authenticity of the originals is supported by way of evidentiary facts.

On the other side of the matter is the knowledge possessed by defendants that Allied was controlled by a person of questionable business standing and that the quantities of oil held in warehouse tanks were so great as to imperil any existing security arrangements. For what it is worth, plaintiffs should have known this too, but they also had a right to protect themselves by reliance on the warehouseman and its receipts.

From defendants' point of view there has not been any showing of sufficient care or explanation to exculpate them from liability. It is not enough to assert that care was taken, describing the practices used, when the disappearance of the oil remains wholly unexplained (*Castorina* v. *Rosen,* 290 N. Y. 445, 447; *National Cash Register Co.* v. *Caillias,* 84 N. Y. S. 166; 5 N. Y. Jur., Bailment, § 78, p. 95). This situation is not at all like that of a bailee showing how carefully the property was secured and that nevertheless the thief broke in and removed the property, without fault on the part of the bailee by any reasonable standard (cf. *Veihelmann* v. *Manufacturers Safe Deposit Co.,* 303 N. Y. 526, including dissenting opn. by DESMOND, J.; 8 C. J. S., Bailments, § 50; 93 C. J. S., Warehousemen and Safe Depositories, § 53, subd. [a]). In showing care, the bailee must explain the loss or damage, and not simply point to a mystery for which it has no better explanation than the bailor (Uniform Commercial Code, § 7–403; N. J. Stat. A., § 12A:7–403).

In addition to the insufficient explanation there is cogent affirmative evidence that Field did not exercise care. A strong datum in this respect, and it is but one of several data avail-

able, is the memorandum of a vice-president of Express to its president under date of June 3, 1963, but relevant to the past, in which he called attention to the conditions which eventually produced the problems presented in these actions.[2]

Hence, while it is true that a warehouseman is not an insurer, he is nevertheless supposed to be a careful watchman, who, if he cannot prevent a loss in the exercise of due care, is at least in a position to explain the loss and show that the loss occurred despite the exercise of due care.

Defendants attempt to excuse the failure to explain the non-existence or disappearance of the oil on the ground that the facts are necessarily not available to it (see CPLR 3212, subd. [f]). It points out, a fact already mentioned, that as part of the May, 1963 reorganization its employees and records relating to the Allied account were transferred to the now bankrupt second bailee, Limited, and consequently are not now under

---

2. The text of the memorandum reads as follows:

"Allied Crude Vegetable Oil Refining Company
New York
June 3, 1963

Mr. H. L. Clark
President

In your letter of May 27, 1963, you requested that we review the file on Allied Crude Vegetable Oil Refining Company and express an opinion as to how we feel about this account.

*I have reviewed the file thoroughly and I am opposed to continuing issuing warehouse receipts for this account.* Our uninsured exposure has been in excess of $60,000,000. I do not feel that a risk of this size is justified by the earning potential of approximately $100,000 per year after taxes on income.

*Another factor in my decision is the record of the President of the company, Mr. Anthony De Angelis.*

\* \* \*

If however it is decided to continue issuing warehouse receipts covering products of this company, I would strongly recommend that the facts and the extent of the risk be made known to the Board of Directors. I would further recommend that our people participate in the weekly inventory and that frequent tests of the product in the tanks be made to insure that they are as represented.

Original Signed by
G. T. PFIFER
G. T. Pfifer
Vice President

cc: Mr. N. F. Page, Senior Vice President
    Mr. R. F. Blanchard, Vice President."

(Emphasis in the original.)

its control.[3] This is not, however, the special situation where the applicable facts are peculiarly within the exclusive knowledge of the party seeking summary judgment (see *Overseas Reliance Tours & Travel Serv.* v. *Sarne Co.,* 17 A D 2d 578).

Plaintiff holders of interests in the warehouse receipts and the bailed oil have no practical way of ascertaining the relevant facts except from the bailees. The total ignorance of the bailees instead of being an excuse is the measure of their fault as warehousemen. Put another way, it is a contradiction for the caretaker to justify his care by flaunting his total lack of knowledge of what happened. To be sure, a bailee may escape liability where there is ignorance of some of the facts, such ignorance itself not being inconsistent with due care, but it is the total ignorance and the completeness of the mystery of the loss which in the circumstances are evidence contradicting the possibility of due care.

Not only is a contradiction involved in a caretaker's asserting due care and total lack of knowledge of what happened or how the mysterious disappearance could have happened, but as a policy matter the granting of legal effect to such an assertion would establish an iniquitous rule. The iniquity would result from the fact that a caretaker would be in a better position to be excused if he knew less than if he knew more.

Thus, whether there was a conversion of actual oil or the false or improper issuance of receipts, summary judgment on the issue of liability should be granted.

There remains the matter of each plaintiff's quantum of recovery; on this issue the theory of recovery may be highly relevant. None of the plaintiffs has established that it held the complete ownership interest in converted oil, but each relies on the general rule that the holder of a special proprietary interest in existing property, such as a mortgagee, pledgee, or lienor, may recover the full value of the converted property and then account for the surplus, if any, to the owner of the general proprietary interest (e.g., *Einstein* v. *Dunn,* 61 App.

3. On March 18, 1964 United States District Judge RYAN gave to Field's attorneys written authorization to inspect the records of the bankrupt second bailee, Limited. This authorization was given shortly before the date of the earliest notice of motion for summary judgment, at least two months before the earliest decision was rendered and almost seven months before the latest decision was rendered. Thus defendant would appear to have had ample opportunity to search these records for pertinent evidence to submit in opposition to the motions for summary judgment. Field may not, therefore, rely on the unavailability of these records to avoid a summary decision.

Div. 195, 201, affd. on opn. below, 171 N. Y. 648; 8 N. Y. Jur., Chattel Mortgages, § 152).

On the other hand, if the oil never existed or was never delivered into the warehouseman's custody, then generally there could have been no conversion. The holder of an interest in a receipt could in such a case recover only its own damages caused by the nonreceipt of oil and false or improper issuance of the receipt (*Corn Exch. Bank* v. *American Dock & Trust Co.*, 163 N. Y. 332, 339; cf. Uniform Commercial Code, § 7–203). Plaintiffs who seek recovery for the false or improper issuance of receipts are limited in their damages to the value of their interests in the oil. The sum of these interests in any receipt may be less than, and can never exceed, the value that the oil described in the receipt would have if it had existed.

Even on a showing of conversion of existing oil actually delivered to the warehouseman, a plaintiff would not necessarily be entitled to recover the full market value of the oil, despite the general rule that one having a special right to immediate possession may recover the full value of the converted property from the wrongdoer and then account to the owner of the remaining proprietary interest for the surplus of market value over the special interest (e.g., *Einstein* v. *Dunn, supra*). This general rule is based on the desirability of avoiding multiplicity of actions, and on the ease with which a special owner can account to the general owner, with whom he often has had contractual relations.

There are, however, exceptions to the general rule. The general rule is one of convenience in litigation; it is not applied in special circumstances where justice requires that the owner of a special interest recover only for the harm suffered (10 N. Y. Jur., Conversion, § 77). This exception may be relevant to the extent that Allied was the purchaser or general owner of much of the oil involved. It would be manifestly unjust to permit any holder to recover in excess of its own loss, only so that it may account for such excess to Allied, against whom, as the alleged perpetrator of the fraudulent conspiracy, Field contends it could assert the defense of fraud. The recovery of the special owner is always so limited when the defendant himself has obtained an interest from the general owner and will himself be entitled to a portion of the total value (e.g., *Parish* v. *Wheeler*, 22 N. Y. 494, 511, 514–515). There is some authority, moreover, that the special owner's recovery must be limited whenever the converting defendant is in " privity " with the owner of the remaining proprietary interest, but on this issue the court need not now pass (see *Davis* v. *Bliss*, 187

N. Y. 77, 84–86; 56 Am. Jur., Warehouses, § 215). The fact that Allied delivered the oil to Field in four of the six cases may establish such privity.

Regardless of which theory of recovery is sustained, conversion or improper issuance of receipts, the value of the existing or nonexisting oil may have to be measured. In conversion plaintiff recovers the value of the property at the time of conversion by defendant's failure to comply with a rightful demand for delivery (*Jones* v. *Morgan*, 90 N. Y. 4, 10; 5 N. Y. Jur., Bailment, § 80). There is no reason why the value of nonexistent oil described in a warehouse receipt should not be measured at the same time, namely, demand and refusal to deliver, whenever such value may be relevant to the measure of recovery. On these appeals plaintiffs claim the value of the oil as stated in warehouse receipts. Since the market value of oil on all subsequent dates should be readily ascertainable, defendant Field's failure to show that such oil had a lower price on the dates of its failure to deliver on demand is not conclusive against it, so long as plaintiffs have also not shown the market values on the relevant dates. Of course, these matters may be easily and quickly disposed of in an assessment of damages. In some instances, the assessment may involve little more than computations or the ascertainment of market values on critical dates. In others, the issues may involve proof of the nature and extent of the other outstanding interests in the receipts or the oil.

It is concluded that in each of the six cases summary judgment should have been granted on the issue of liability only, and that a hearing should be held to assess in each case the actual losses incurred by each plaintiff on Field's failure to deliver oil on demand.

It is necessary now to discuss the differences in the fact situations presented by each case, in order to define the issues to be resolved at the hearings on damages.

In the cases of Procter & Gamble and National Dairy the plaintiffs had sold or had contracted to sell the bailed oil to Allied and had, in each instance, received from Allied a substantial "margin" payment for this oil. These payments were designed to eliminate the risk in a declining market that Allied would default on the purchase contracts. In addition to "margin", National Dairy also managed to obtain from Allied a sum as further partial payment of the price. Their damages are the contract price to Allied less margin and other payments received by the plaintiff and allocable to the price. In no event, however, should damages exceed the market value on the date

Field defaulted in complying with a demand to deliver the oil or on which plaintiff discovered that such a demand would not be honored.

Neither Armstrong nor Garnac has established the amount of indebtedness to each of these plaintiffs secured by the bailed oil. At the hearing on damages they should show the amounts of such indebtedness and may recover such amounts as they prove, but in no case may the recovery exceed the value of the oil on the date of Field's failure to deliver in response to a demand.

Continental Grain submits the affidavit of its vice-president that the indebtedness of Allied to Continental secured by the warehouse receipts exceeded $2,700,000, without supporting documentation. This figure is greater than the recovery sought by Continental and will almost certainly exceed the applicable market value of the oil. Continental should, perhaps, submit more detailed proof of Allied's indebtedness. Its damages should be the lesser of market value or the value of the secured indebtedness.

Williston & Beane and Continental Illinois (the bank associated with it) submit a sworn statement that the indebtedness of Allied secured by warehouse receipts is $1,178,219.72, but fail to prove the applicable market value of the oil. Their recovery should be the lesser of the secured indebtedness or the value of the oil on the date of Field's failure to deliver.

In each case the money judgment to be obtained on the assessment of damages pursuant to this court's present order should be without prejudice to the right of each plaintiff to prove at the trial a theory of recovery which may increase its measure of damages.

Accordingly, the order in the Procter & Gamble case granting complete summary judgment should be modified, on the law, to grant partial summary judgment on the issue of liability only and to order an assessment of damages, with costs and disbursements to plaintiff. Each of the other orders, which granted partial summary judgment and directed an assessment, should be affirmed, with costs and disbursements to plaintiff on the appeal but not on the cross appeals, as to which there should be no costs or disbursements allowed to either party.

VALENTE, MCNALLY, STEVENS and STEUER, JJ., concur.

Order, entered on June 9, 1964 (*Procter & Gamble Distr. Co.* v. *Lawrence American Field Warehousing Corp.*) granting complete summary judgment, unanimously modified, on the law, with $30 costs and disbursements to plaintiff-

respondent, so as to grant partial summary judgment on the issue of liability only and to order an assessment of damages. Orders, entered on September 18, 1964 and November 2, 1964, unanimously affirmed, with $30 costs and disbursements to plaintiff-respondent on the appeal but not on the cross appeals, as to which there are no costs or disbursements allowed to either party. Settle order on notice.