ICC INDUSTRIES, INC., Plaintiff,

and

Continental Insurance Company, Involuntary Plaintiff,

v.

GATX TERMINALS CORPORATION, Defendant.

No. 85 Civ. 1406 (MBM).

United States District Court, S.D. New York.

July 6, 1988.

---

**2.** Alexander Pope *An Essay on Man,* II, 13;    *Poems,* Endicott and Rhodes, London, 1837.

Alexander Peltz, Dwyer, Peltz & Walker, New York City, for plaintiff.

Frederick B. Polak, Irwin Post & Rosen, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff ICC Industries, Inc. and involuntary plaintiff Continental Insurance Company, by way of subrogation, bring this action against defendant GATX Terminals Corporation to recover the value of a quantity of methyl methacrylate monomer ("MMM") which was lost during March and April 1984 while being stored by GATX pursuant to a bailment agreement between ICC and GATX. ICC filed a claim for the loss with its insurer, Continental, under which Continental paid ICC $69,257.10, the full value of the lost MMM claimed by ICC. Plaintiff ICC also seeks to recover the cost of modifications to the tank in which the MMM was stored, which were made by GATX and paid for by ICC under the agreement. GATX counterclaims against ICC for breach of the provision in the agreement requiring ICC to obtain a waiver of subrogation rights from its insurer, and Continental cross-claims against ICC for breach of the impairment of subrogation clause in the insurance policy under which the MMM was insured. This Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332.

Plaintiffs charge defendant in the second amended complaint with breach of the bailment agreement (Count I); breach of implied warranty (Count II); breach of the bailment agreement by failing properly to modify the storage tank (Count III); willful and material breach of the bailment agreement by the officers and executive management of GATX (Count IV); and conversion (Count V).

GATX moves pursuant to Rule 56, Fed. R.Civ.P., for partial summary judgment on Count I of the second amended complaint and for summary judgment on the remaining claims, Counts II through V, or alternatively, for summary judgment on its counterclaims against ICC.[1] For the reasons set forth below, partial summary judgment

---

1. GATX made an earlier motion for summary judgment on or about March 26, 1986 which was dismissed without prejudice by Judge Mary Johnson Lowe by Memorandum Opinion and Order dated July 16, 1986. In her order dismissing the motion, Judge Lowe granted plaintiff leave to amend the complaint and ordered that plaintiff Continental be joined as a necessary party.

is granted on Count I of the second amended complaint limiting GATX's liability to $0.55 per gallon, and summary judgment is granted dismissing Counts II through V of the second amended complaint.

## I.

The agreement between ICC and GATX provided, among other things, that "GATX shall in no event be liable for more than the actual cost of Commodities to Customer, less salvage value, or $0.55 per gallon, whichever is less, of any lost or damaged Commodities, losses or damages due to improperly loaded Commodities or actions not conforming to Customer's orders nor for special or consequential damages, *no matter how loss or damage shall have occurred unless such damage or loss shall be caused by the willful and material breach of this Agreement by the officers or executive management of GATX.*" (Agreement ¶ 12(a)) (emphasis added). ICC expressly recognized in the agreement that without the limited liability provision, GATX would charge higher storage fees. (*Id.*) In addition, the parties waived all express or implied warranties, "including, but not limited to, any warranties of merchantability or fitness for a particular purpose, whether arising by operation of law or otherwise." (Agreement ¶ 12(b)) The agreement further provided that ICC was required to obtain a waiver of subrogation against GATX from any insurance company with which it insured the MMM. (Agreement ¶ 8)

Further, the agreement provided that ICC was to pay for modifications to be made by GATX to tank 5–13H, in which the MMM was to be stored. The agreement also provided that GATX could store the MMM in substitute tanks, provided that those tanks were "of adequate or equal capacity and equal or better quality to the

tank covered by the agreement." (Agreement ¶ 13) The modifications to tank 5–13H appear to have been completed before March 1, 1984. (Varga Aff. ¶ 22) [2]

## II.

This motion raises two threshold legal issues. The first relates to choice of law. Because New York is the forum state I am bound to follow New York choice of law rules. *Bader v. Purdom*, 841 F.2d 38, 39 (2nd Cir.1988). With regard to cases involving tort and breach of contract claims, those rules provide that " 'the law of the jurisdiction having the greatest interest in the litigation will be applied.' " *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 480 N.E.2d 679, 491 N.Y. S.2d 90 (1985) (citation omitted); *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.*, 37 N.Y.2d 220, 333 N.E.2d 168, 371 N.Y.S.2d 892, 898 (citation omitted), *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). Under the circumstances of this case, the interests of New Jersey, where the defendant maintained the facility at which the MMM was stored and where the loss occurred, appear to outweigh the interests of New York and Delaware, where the parties are domiciled. *See National Resources Trading, Inc. v. Trans Freight Lines*, 766 F.2d 65, 68 (2d Cir. 1985); *see also National Dairy Products Corp. v. Lawrence American Field Warehousing Corp.*, 22 A.D.2d 420, 429, 255 N.Y.S.2d 788, 798 (1st Dep't), *rev'd on other grounds*, 16 N.Y.2d 344, 213 N.E.2d 873, 266 N.Y.S.2d 785 (1965) (New Jersey law applied in conversion action involving goods stored in New Jersey). Accordingly, I find that because New Jersey appears to have the greatest interest in this litigation, a New York court would apply New Jersey law in this case.

**2.** GATX submitted affidavits of Elias Vargas, the assistant operations manager at the Carteret facility during the spring of 1984 and now the operations manager there, and of Kelly Samu, the inventory supervisor at GATX's Carteret storage facility during the spring of 1984, and now the assistant office manager there, explaining how MMM is stored and how the loss of MMM occurred. References to the Vargas affidavit dated February 8, 1988 are denoted "Vargas Aff. ¶ ___." References to the Vargas affidavit dated March 23, 1988 are denoted "Vargas Reply Aff. ¶ ___." References to the Samu affidavit dated May 7, 1986 are denoted "Samu Aff. ¶ ___."

■ The second legal issue presented by this case is whether Continental has standing to maintain this action as ICC's subrogee. As stated above, ICC was obligated under its agreement with GATX to obtain a waiver of subrogation against GATX from any insurance carrier with which it insured the MMM. ICC concedes that although it raised no objection to this requirement when it entered into the agreement, it nonetheless failed to obtain the waiver from its carrier, Continental. It does not appear that ICC could have obtained such a waiver inasmuch as its insurance policy—which was already in place when ICC entered into the bailment agreement with GATX—contained a clause expressly prohibiting ICC from waiving the insurer's subrogation rights.

■ Continental cannot be bound by a waiver of subrogation to which it was not a party and of which it was not aware. *Continental Insurance Co. v. Washeon Corp.*, 524 F.Supp. 34, 36 (E.D.Mo.1981); *Alamo Chemical Transportation Corp. v. M/V Overseas Valdes*, 469 F.Supp. 203, 212 (E.D.La.1979). Accordingly, Continental may maintain this subrogation action.

Although Continental is permitted to maintain this action as subrogee, it has no greater rights than those of ICC, its subrogor. *Great American Insurance Co. v. United States*, 575 F.2d 1031, 1033–35 (2d Cir.1978); *Aetna Insurance Co. v. Gilchrist Bros., Inc.*, 85 N.J. 550, 560–61, 428 A.2d 1254 (1981). Accordingly, its claims against GATX are subject to all of the defenses GATX has against ICC, including the liability limitation and waiver of warranty provisions in the bailment agreement.

### III.

Summary judgment should be granted when it appears that there are no material facts in dispute. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). When the party moving for summary judgment has made a

properly supported motion, the opposing party cannot simply rely on his pleadings, but must come forward with specific facts showing that there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court —will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (*per curiam*). Nor may the party opposing summary judgment "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.* Summary judgment is appropriate when a charge is based only on surmise, conjecture and suspicion, particularly where, as here, there has been full disclosure.[3] *Guitar v. Westinghouse Electrical Corp.*, 396 F.Supp. 1042, 1053 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 309 (2d Cir.1976).

*The Breach of Contract Claims (Counts I, III and IV)*

■ Because the agreement expressly limits plaintiff's recovery to the agreed upon amount "no matter how loss or damage shall have occurred unless such damage or loss shall be caused by the willful and material breach of this Agreement by the officers or executive management of GATX," plaintiff cannot recover the full amount of the loss under its breach of contract claims unless it can show that the loss was caused by the willful and material breach of the agreement by the officers or executive management of GATX. As discussed below, although plaintiff has raised questions about whether GATX has managed to account precisely for each gallon lost, it has not raised a question of fact as to whether the loss was the result of a material and willful breach by the officers or executive management of GATX; defendant is therefore entitled to partial summary judgment limiting damages to $0.55 per gallon.

---

**3.** ICC took discovery by serving interrogatories, depositing GATX employees and examining documents.

The evidence submitted on this motion by both sides makes it clear that some amounts of MMM are unavoidably lost in the process of storing and transferring the substance.[4] GATX explained that MMM is stored in tanks which are surrounded by dikes containing drains through which leaked amounts of MMM are channeled into an internal waste water collection separator system. (Varga Reply Aff. ¶ 3) Accordingly, when a leak occurs at a tank, it is not possible to measure precisely through observation the extent of the loss because MMM evaporates quickly and also because it cannot be measured once it passes into the separator system. (*Id.* at ¶ 4)

It is not disputed that approximately 16,948 gallons of MMM were lost between March 1, 1984 and April 10, 1984. Plaintiff attempts to discredit defendant's explanation of how the loss occurred by pointing out various discrepancies in defendant's account of the several incidents in which the MMM was lost. For example, plaintiff cites disparities between GATX's measurement of losses based on gauge readings, and estimates of loss contained in accident reports prepared contemporaneously with the leaks, which estimates were based only on a visual inspection of the loss site. Although GATX has not accounted precisely for every gallon of MMM which was lost, it has provided a plausible explanation for how the series of transfers and leaks resulted in a total loss of some 16,948 gallons over a six week period. GATX's explanation of how the loss of MMM occurred is summarized as follows:

On or about March 1, 1984, the M/V Bow Cedar delivered the MMM to GATX's storage facility in Carteret, New Jersey. Prior to unloading, 139,934 gallons of MMM were measured on board. On March 1, 1984, the pumping of the MMM into tank 5–13H began, but stopped when a leak in the tank was discovered. It took more than half an hour to find the source of the leak and to plug it temporarily. (Samu Aff. ¶¶ 4–5; Varga Aff. ¶¶ 8–9) The MMM was then transferred to tank 10–19 for temporary storage. (Varga Aff. ¶ 12) GATX estimates that 2,946 gallons were lost as a result of this leak, and that an additional 1,485 gallons were disposed of as unusable after being flushed from the dock lines to tanks 5–13H and 10–19. (Samu Aff. ¶ 9; Varga Aff. ¶¶ 13, 16)

By March 26, 1984, the leak in tank 5–13H was repaired, and the MMM was shipped in tank trucks from tank 10–19 to tank 5–13H over a period of approximately one week. (Varga Aff. ¶¶ 14–15) Based on weight tickets for the tank trucks and records showing the amount of MMM that was stripped from tank 10–19 and lines, GATX estimates that 132,549 gallons of MMM were transferred from tank 10–19 to tank 5–13H. GATX estimates that 2,926 gallons of MMM were lost in the line system and in tank 10–19's heels, and also through breathing and evaporation during the transfer from tank 10–19 to tank 5–13H. (Varga Aff. ¶ 16) An additional estimated 6,282 gallons of MMM were lost during the transfer due to a leak in the pump of tank 5–13H which was not discovered for several days because of heavy rain. (Samu Aff. ¶ 10; Varga Aff. ¶ 15) On April 5, another leak was discovered at the pump on tank 5–13H. GATX estimates that 1,957 gallons were lost between April 3 and April 5 on account of this leak. (Varga Aff. ¶ 18) A final mishap occurred on April 10, when gas leaked from the tank pump's mechanical seal and a fire broke out. (Varga Aff. ¶ 20)

4. GATX explained that when MMM is stored in a tank, a certain amount of loss results from "breathing" through conservation vents in the tank. The tank breathes in when the weather is cooler and breathes out when the weather is warmer. This breathing is necessary to prevent the tank from bulging out, causing possible damage to the tank walls, and from contracting, causing possible collapse of the tank walls. (Varga Aff. ¶ 6) GATX further explained that additional quantities of MMM are lost in "heels," that is, amounts that accumulate in the bottom of the tank which cannot be retrieved because of the surface of the tank's bottom. (*Id.*) In addition, a certain amount of MMM is lost whenever MMM is transferred through a pipeline. According to GATX, although some of the residual amount can be collected by a process known as blowing the pipeline, as much as 35% can be left in the pipeline after the line has been blown. (Varga Aff. ¶¶ 7, 17)

**1288**

Plaintiff claims that partial summary judgment should not be granted because there are questions of fact as to how the loss of MMM occurred. But this argument is unavailing because it ignores the broad language of the agreement which limits GATX's liability for loss of the MMM. To withstand this motion for summary judgment, it is not enough for plaintiff simply to point out apparent discrepancies in defendant's explanation of how the loss occurred. Rather, plaintiff must come forward with evidence showing that the loss was the result of a willful breach of the agreement by the officers or executive management of GATX. To demonstrate willfulness, plaintiff must show that GATX consciously and intentionally performed wrongful acts, or omitted to discharge duties, with knowledge or reckless disregard that injury would be likely to result. *McLaughlin v. Rova Farms, Inc.*, 56 N.J. 288, 266 A.2d 284, 293 (1970).

ICC has failed to adduce any evidence of willfulness. Indeed, it claimed in its responses to interrogatories that the loss was caused by GATX's negligence (Exh. D to Def. Brief in Support of Motion, Response to Interrogatory No. 17), and Irwin Kramer of ICC admitted at his deposition that he had no reason to believe that GATX deliberately lost the MMM (Exh. E to Def. Brief in Support of Motion, p. 58, lines 6–8). Although plaintiff's assertion that GATX failed to take steps to prevent the leaks might state a claim in negligence, it falls far short of raising a question of fact as to willfulness. "Negligence and willfulness are mutually exclusive terms which imply radically different mental states. 'Negligence' conveys the idea of inadvertence as distinguished from premeditation or formed intention." *King v. Patrylow*, 15 N.J.Super. 429, 83 A.2d 639, 641 (1951).

The standard for granting summary judgment is the same as that for granting a directed verdict: if the evidence offered by the non-moving party is such that the court would be compelled to direct a verdict against it in a jury trial, summary judgment must be granted. *Eastman Machine Co. v. United States*, 841 F.2d 469 (2d Cir.1988). Here, summary judgment must be granted on the question of willfulness because, on the evidence adduced on this motion, a jury's conclusion that the loss of MMM was caused by the willful conduct of GATX's officers or executive management could result only from impermissible speculation. *See Aaron Ferer & Sons v. Chase Manhattan Bank*, 731 F.2d 112, 121–22 (2d Cir.1984).

■ ICC also contends that the agreement provided for storage only in tank 5–13H, so that any losses of MMM which occurred while the MMM was not in tank 5–13H are not covered by the liability limitation. This argument is meritless because it overlooks the agreement's express provision that the MMM could be stored in a substitute tank, provided that it was of adequate or equal capacity and of equal or better quality than tank 5–13H, the tank covered by the agreement. ICC offers no evidence refuting GATX's averments that tank 10–19, where the MMM was temporarily stored, was of adequate capacity and better quality than tank 5–13H and thus was wholly adequate as a substitute storage facility. (Varga Reply Aff. ¶¶ 20, 41) ICC's claim that tank 10–19 was not a substitute tank under the agreement is based entirely on the conclusory assertions of its attorney, Alexander Peltz, that

> Tank 10–19 ... had not been modified and was not capable of being used as a tank for the storage of MMM for any long term and was not intended to be and was not a substitute tank. Tank 10–19, lacking the modifications, was certainly not 'equal or better in quality' to the tank covered by the contract. The fact that the MMM was eventually removed from tank 10–19 within a month's time and transferred to tank 5–13 is evidence that tank 10–19 was merely a temporary tank.

(Peltz Aff. March 15, 1988, ¶ 25)

But the agreement did not require that the substitute tank be suitable for long term storage of MMM. Furthermore, GATX explained that the only feature that tank 10–19 lacked was a circulation system which is necessary for the safe storage of MMM

only when the outdoor temperature exceeds 100 degrees. (Varga Reply Aff. ¶ 20) Thus it appears that tank 10–19 was an adequate substitute storage facility during March, when the MMM was stored there.

■ Finally, I dismiss ICC's claim for the $41,504 it paid GATX for modifications of tank 5–13H under the agreement. ICC claims that the tank was "not fit and suitable for storage and handling of MMM" when the MMM was delivered and that it is therefore entitled to recover the cost of the modifications. But ICC has not shown that any portion of the loss claimed resulted from inadequacy in the modifications. To the contrary, it appears that the losses were caused by leaks in the pump manifold area of the tank, which was not modified under the agreement. (Varga Reply Aff. ¶¶ 15–16) Accordingly, ICC has failed to show that it suffered any damage as a result of the alleged deficiencies in the modifications. But even assuming *arguendo* that ICC had made such a showing, it would still not be entitled to reimbursement for the modifications because, as discussed above, any losses sustained by ICC are recoverable only to the extent allowed under Section 12(a) of the agreement.

ICC's claim must be rejected for the further reason that GATX paid for all the repairs to the tank and plaintiff continues to store MMM and other substances in the tank without apparent difficulty (Exh. B to Def. Brief in Support of Motion, Response to Interrogatory No. 15; Varga Aff. ¶ 22); accordingly, ICC has received the benefit of the modifications and is not entitled to recoup their cost.

■ Finally, ICC's claim that the modification expense should be awarded as liquidated damages is meritless. Liquidated damages can be awarded only when parties have agreed in advance that a certain sum will be awarded as a remedy for a breach of the agreement. *Matter of Community Medical Center*, 623 F.2d 864, 867 (3d Cir. 1980) (applying New Jersey law). Here, there was no agreement between ICC and GATX regarding liquidated damages and therefore plaintiff cannot claim them.

Accordingly, partial summary judgment is granted on Count I of the second amended complaint awarding plaintiffs $9,321.40 and summary judgment is granted dismissing Counts III and IV.

*The Breach of Warranty Claim (Count II)*

■ Count II of the second amended complaint charges that GATX "breached its implied warranty of workmanlike performance." This claim is barred by Section 12(b) of the agreement which provides that:

EXCEPT AS EXPRESSLY HEREIN PROVIDED, THERE ARE NO GUARANTEES OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE.

Because there appears to be no reason why this provision expressly waiving implied warranties is not enforceable, summary judgment is granted dismissing Count II of the second amended complaint.

*The Conversion Claim (Count V)*

Summary judgment is also granted dismissing Count V of the second amended complaint for conversion. Under the Uniform Commercial Code as adopted in New Jersey, GATX, as an entity engaged in the business of storing goods for hire, is a "warehouseman." N.J.S.A. 12A:7–102(1)(h). The Code recognizes that a warehouseman may limit its liability to a bailor by entering into an agreement setting a limit based on a certain value per unit of weight, but provides that "[n]o such limitation is effective with respect to the warehouseman's liability for conversion to [its] own use." N.J.S.A. 12A:7–204(2).

■ While the Supreme Court of New Jersey has yet to address the issue squarely, it appears that under New Jersey law, a warehouseman who fails to come forward with an adequate explanation for its failure to return bailed goods is liable for conversion. *See National Resources Trading, Inc. v. Trans Freight Lines*, 766 F.2d 65, 68 (2d Cir.1985) (applying New Jersey law).

In *Joseph H. Reinfeld, Inc. v. Griswold and Bateman Warehouse Co.*, 189 N.J.Super. 141, 458 A.2d 1341 (1983), the Superior Court of New Jersey, Law Division, held that once a plaintiff has presented a *prima facie* case of conversion by showing delivery of the bailed goods to the defendant bailee, demand for return of the goods and the defendant's failure to return them, the burden of proof shifts to the defendant to explain how the goods were lost, and that once the defendant has produced evidence of how the loss occurred, the plaintiff must prove all the elements of conversion. 458 A.2d at 1343. In so holding, the New Jersey court cited with approval the decision of the New York Court of Appeals in *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 409 N.E.2d 849, 431 N.Y.S.2d 372 (1980). In that case, the Court of Appeals held that a bailee must provide "an adequate explanation of the reasons for its failure to properly return the stored property," and that once the bailee offers evidentiary support for the explanation sufficient to create a question of fact, the "burden of proving the warehouse to be at fault will fall squarely upon the plaintiff." 431 N.Y.S.2d at 378–79, 409 N.E.2d at 854–56.

I find that GATX's explanation of how the MMM was lost is more than adequate to discharge its burden of coming forward with a sufficient explanation for the loss. Defendant is not required to account for every gallon of MMM spilled. To impose on GATX such a burden would be unreasonable in this case inasmuch as GATX has accounted for a substantial amount, if not all, of the MMM, and there is no evidence whatever that GATX took any portion of the MMM for its own use.

It is not true, as ICC suggests, that GATX has given three different explanations for how the loss occurred. Kelly Samu, the inventory supervisor at the GATX Carteret facility when the loss occurred, explained in her affidavit the reasons for errors that were made by Thomas Coughlin, a GATX claims manager who has since retired, in the original calculation of the loss. Elias Vargas, the operations manager of the GATX Carteret facility, adopted Samu's averments and explained in greater detail how the loss occurred. There are no discrepancies between Samu's and Vargas' explanations of the loss, and thus, plaintiff's claim that "the three explanations that have been offered by GATX permit the conclusion that there is no actual explanation" (Plaintiff's brief at 11) is meritless.

I also reject ICC's claim that GATX's explanation for the loss is "preposterous." ICC's position is based in large part on the speculation and conjecture of its attorney and its traffic managers Emil Schoen and Irwin Kramer. On a motion for summary judgment, this Court may consider only evidence which would be admissible at trial. Rule 56(e), Fed.R.Civ.P.; *see, e.g., Nadler v. Baybank Merrimack Valley, N.A.,* 733 F.2d 182, 184 (1st Cir. 1984); *Sires v. Luke,* 544 F.Supp. 1155, 1160 (S.D.Ga.1982). Affidavits filed in support of or in opposition to summary judgment motions must be made on personal knowledge by an affiant who is competent to testify to the matters stated therein. Rule 56(e), Fed.R.Civ.P. *See, e.g., United States v. Bosurgi,* 530 F.2d 1105, 1111 (2d Cir.1976). Accordingly, to the extent that ICC's affidavits are not based on personal knowledge, or are based on hearsay, they are inadmissible.

ICC also attempts to discredit GATX's explanation by citing several contemporaneous accident reports which estimated the amounts of MMM lost in each incident. But as discussed above, GATX explained that these reports are not made for the purpose of specifying the amount of product lost, but only to document as quickly as possible incidents at the facility. The amount lost as stated on these reports is a rough estimate based on visual inspection of the accident site without gauge readings. (Samu Aff. ¶ 15) GATX further explained that leaked MMM drains from a dike which surrounds the tank into an internal waste water collection separator system, and that when MMM is exposed to air it evaporates quickly. (Varga Reply Aff. ¶¶ 3–4) Accordingly, it appears that the amounts estimated in the reports did not

accurately reflect the total leaked, but only the amount collected in the dike that had not yet drained into the separator system.

■ Because defendant has satisfied its burden of coming forward with a satisfactory explanation for the loss, the burden shifts to plaintiff to prove all the elements of conversion. *Joseph H. Reinfeld, Inc. v. Griswold and Bateman Warehouse, Inc., supra,* 458 A.2d at 1343. To demonstrate conversion, plaintiff must show that defendant engaged in intentional conduct; mere negligence is not sufficient. *Gunther v. Morey Larue Laundry Co.,* 129 N.J.L. 345, 29 A.2d 713, 714, (N.J.Sup.Ct.), *aff'd mem.,* 130 N.J.L. 557, 33 A.2d 893 (1943). Plaintiff has failed to adduce any evidence that the loss of the MMM resulted from the intentional conduct of GATX.

■ Finally, it appears that plaintiff brings this conversion claim in an attempt to circumvent the well established rule that parties to a bailment agreement may limit the liability of the bailee, and where there is mutual assent to the limitation, the terms of the agreement govern the rights and liabilities of the parties. *Silvestri v. South Orange Storage Corp.,* 14 N.J.Super. 205, 81 A.2d 502 (1951). Plaintiff cannot avoid this bargained for limitation by bringing an action for conversion where, as here, there is no evidence whatever of willful conduct on the part of anyone at GATX. Accordingly, summary judgment is granted dismissing Count V of the second amended complaint.

For the foregoing reasons, partial summary judgment is granted on Count I limiting plaintiffs' recovery on Count I to $0.55 per gallon for the 16,948 gallons of lost MMM, and summary judgment is granted dismissing Counts II through V of the second amended complaint. The parties are directed to settle judgment accordingly.

SO ORDERED.