494 F.2d 287
 STEIN HALL & CO., INC., and Swift & Company, Plaintiffs,
v.
S.S. CONCORDIA VIKING, her engines, boilers, etc., and Skibs
A/S Samuel Bakke, Defendant and Third-Party
Plaintiff-Appellee, v. PITTSTON
STEVEDORING CORP., Third-Party
Defendant-Appellant.
 No. 345, Docket 73-1716.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 14, 1974.
Decided March 13, 1974.
 
 Paul Falick, New York City (Bigham, Englar, Jones & Houston and John L. Quinlan, New York City, on the brief), for appellant Pittston Stevedoring Corp.
 M. E. DeOrchis, New York City (Haight, Gardner, Poor & Havens and Ara A. Shimshidian, New York City, on the brief), for appellee Skibs A/S Samuel Bakke.
 Hill, Betts & Nash and Daniel K. Read, New York City, on amicus curiae brief for International Terminal Operating Co., Inc.
 Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.
 ROBERT P. ANDERSON, Circuit Judge:
 
 
 1
 On September 23 and 24, 1967, the S.S. Concordia Viking took on board at Port Sudan thousands of bags of gum arabic, including 1455 bags consigned to the Port of New York under the four clean bills of lading contested in this case. The ship's agent, dockside at Port Sudan, tallied each consignment before it was loaded. The mate of the Concordia Viking did not check the cargo as it came on board but testified that in any event he would have relied on the agent's tally in issuing the mate's receipts certifying that the four shipments were complete. The ship's manifest stated that the ship was carrying the bags of gum which it had contracted to transport under the bills of lading.
 
 
 2
 The Concordia Viking sailed directly to the Port of New York where it was assigned a Newark terminal operated by the Pittston Stevedoring Corporation, which unloaded the ship between October 24 and 27 in accordance with a discharge plan based on New York shipments, including the gum, described in the manifest. No one counted the cargo during or after unloading, and no one noticed any shortages. After discharge, the mate inspected the hatches to make sure that all New York cargo had been unloaded.
 
 
 3
 The stevedores arranged the bags on the pier according to consignments and they were left there awaiting the consignees, who called for the goods during the following weeks. They were, however, unable to locate their complete orders and complained to the ship's new York agent who in turn asked Pittston to report what cargo it had on hand. On January 2, 1968, Pittston notified the Concordia Viking that 178 bags of gum under these bills of lading were missing. Some shipments were particularly short; one bill of lading called for 100 bags, but 54 of these were missing. Despite the shortages, Pittston had charged consignees demurrage based on the complete consignments described in the bills of lading.
 
 
 4
 The ship sent tracer sheets to the ports subsequently visited by the Concordia Viking, but none of the missing bags was reported. The terminal operator admits misdelivery of other consignments of gum from the same unloading operation, but no one knows what caused the loss in this case.
 
 
 5
 Shippers Stein Hall & Co., Inc., and Swift & Company brought this libel against the ship and its owner, Skibs A/S Samuel Bakke, for the shortages. The defendant carrier impleaded Pittston; and they then settled with the plaintiffs for $10,000 and asked the court below to allocate damages.
 
 
 6
 The court found that Pittston had taken control of the cargo and that it was liable for the loss on either of two grounds. First, under the stevedoring contract, Pittston gave an implied warranty of workmanlike service competently to perform the carrier's statutory and contractual obligations for the discharge of the cargo. Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); David Crystal, Inc. v. Cunard Steam-Ship Co. Ltd., 339 F.2d 295 (2 Cir. 1964), cert. den., 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); The Harter Act, 1, 46 U.S.C. 190. Failure on the part of the stevedore to explain what occurred to the cargo in its control gives rise to a presumption that the stevedore breached this implied warranty.[1] Second, once Pittston as the terminal operator took possession of the cargo, it became a bailee for the mutual benefit of the carrier and consignees. Doak, Liabilities of Stevedores, Terminal Operators and Other Handlers in Relation to Cargo, 45 Tul.L.Rev. 752 (1971). 'The absolute obligation of the bailee is frequently phrased by the modern authorities as a duty to restore the property, or to account for it,' 8 Am.Jur.2d Bailments 176, and the failure to account in this case constitutes negligence as a matter of law. Pittston contends, however, that there is no proof that it ever had custody of the cargo.
 
 
 7
 The court below based its conclusion that all New York cargo from Port Sudan was discharged in Newark on the facts that the ship made no stops between Port Sudan and Newark; that the mate inspected the hatches after unloading and found no New York cargo; that the stevedore presented no evidence that the cargo remained on board; that at no time did Pittston make any claim or put the ship on any notice that there was any shortage; and that the cargo tracer sheets failed to locate any of the missing bags. The judge was surely not clearly erroneous in so finding. Middle East Export Co. v. Concordia Line, 64 Misc.2d 270, 314 N.Y.S.2d 390 (Cir.Crt Cty of N.Y., 1970), aff'd71 Misc.2d 365, 336 N.Y.S.2d 217 (Sprm Crt App. Term 1st Dpt 1972).
 
 
 8
 Proof that the disputed goods were actually loaded was almost entirely documentary. The carrier introduced, over the stevedore's objections, the four bills of lading, the manifest, and the mate's receipts. All of these were issued in Port Sudan, and as evidence against Pittston, they were hearsay. Intermondale Trading Co. v. North River Ins. Co. of N.Y., 100 F.Supp. 128 (S.D.N.Y.1951); M.W. Zack Metal Co. v. Federal Ins. Co., 1961 A.M.C. 1547 (Sprm Crt N.Y. Cty 1961), aff'd 17 A.D.2d 141, 232 N.Y.S.2d 940 (Sprm Crt App.Div. 1st Dpt 1962), aff'd 13 N.Y.2d 952, 244 N.Y.S.2d 319, 194 N.E.2d 134 (Crt of App.1963).
 
 
 9
 The district court held the bills of lading admissible under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1303(4), which provides, 'a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described.' The court ruled that this clause bound the stevedore as the carrier's agent and that the failure of the bills to describe any shortages gave rise to a presumption that the shipments were complete. A.C. Israel Commodity Co., Inc. v. American-West African Line, Inc. v. Lavino Shipping Co., 1968 A.M.C. 139 (E.D.Penn.1967), aff'd 397 F.2d 170, 1968 A.M.C. 1517 (3 Cir.), cert. den. 393 U.S. 978, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968).[2] But the Supreme Court has held that COGSA's purpose was 'to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade' and that the Act does 'not advert to stevedores or agents of a carrier.' Robert C. Herd & Co., Inc. v. Krawhill Machinery Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959). Just as the damage limitation provided carriers under the Act does not protect stevedores, Herd, the liabilities of carriers under the Act likewise cannot be extended to stevedores.
 
 
 10
 The bills are also not admissible against the stevedore as an admission by contract. The stevedore is not a party to the bills of lading and is not bound by their terms unless it contracts to be so. While the carrier and the shipper can extend certain contractual protections, such as the limitation on damages, to stevedores as third-party beneficiaries, Bernard Screen Printing Corp. v. Meyer Line, 464 F.2d 934 (2 Cir. 1972), cert. den.410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973), they cannot contract to bind an unconsenting third party.
 
 
 11
 The court, however, did not err in admitting the bills because they are business records and, therefore, exceptions to the hearsay rule. 28 U.S.C. 1732(a). The mate testified that it was a part of the ship's business to make and keep such records; and that these bills were made in accordance with that practice. V Wigmore 1521.
 
 
 12
 The Supreme Court differentiating reliable from unreliable business records, has said 'payrolls, accounts receivable, accounts payable, bills of lading and the like' are entitled to a presumption of accuracy and are clearly admissible because they are 'typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls.' Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1943). The records of common carriers are presumed to be accurate because they are relied on by so many parties,[3] V Wigmore 1521, including in this case the terminal operator which calculated demurrage on the basis of the bills of lading it now seeks to discredit.
 
 
 13
 Pittston claims the bills are self-serving when introduced by the party that issued them. But the ship had no motive to misrepresent at the time of issuance. V Wigmore 1527. If the goods had been lost while in control of the ship, the bills would have established the ship's liability.[4]
 
 
 14
 Pittston objects that only the former mate, Captain Tresnes, testified about the issuance of these particular bills. Captain Tresnes said that he witnessed the tallying dockside and that he would have relied on the tally sheets in issuing the clean bills of lading and the mate's receipts. Pittston states that the ship's agent should have been available to testify or that the tally sheets should have been produced.
 
 
 15
 This circuit has always interpreted the business records exception 'most liberally.' Smith v. Bear, 237 F.2d 79, 89 (2 Cir. 1956). 'The statute was designed to bring the realities of business and professional practice into the courtroom in usable form,' Korte v. N.Y., N.H. & H.R. Co., 191 F.2d 86, 91 (2 Cir.), cert. den. 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 (1951), and to require complete evidentiary support, either by the testimony of the entrant or by the introduction of the items on which each entry is based, would 'cook the egg by burning down the house.' Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 18 F.2d 934, 937 (2 Cir. 1927) (L. Hand, J.). See also Louisville & Nashville Railroad Co. v. Knox Homes Corp., 343 F.2d 887, 895-896 (5 Cir. 1965). Where records, such as the clean bills, result from a reliable business procedure witnessed by a supervisor, such as the mate, the testimony of that witness describing the procedure and swearing that the records resulted from that procedure is sufficient to establish admissibility, and the lack of any other supporting testimony or evidence is relevant only to the weight to be accorded such records. United States v. Mortimer, 118 F.2d 266 (2 Cir. 1941) cert. den.314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496 (1942); V Wigmore 1521.[5]
 
 
 16
 Every vessel arriving in the United States must have a manifest in a form provided by the Treasury Department; and the master of the ship gives his oath to its truthfulness. The manifest must 'contain . . . a detailed account of all merchandise on board such vessel, with marks and numbers of each package, and the numbers and descriptions of the packages, according to the usual name or denomination, such as barrel, key, hogshead, case or bag.' 19 U.S.C. 1431. Failure to produce a manifest certified by the master can result in a fine. 19 U.S.C. 1439, 1445; and the master or ship can be held liable for the value of any merchandise not listed. 19 U.S.C. 1584. Testimony established that the Concordia Viking's manifest was drafted in the usual course of business and that it was the ship's business regularly to draft such manifests; it was, therefore, admissible as a business record. 28 U.S.C. 1732. Even absent this testimony, a manifest which has been certified by customs officials has historically been held 'clearly admissible.' United States v. Richard Johns, 4 U.S. (4 Dall.) 412, 1 L.Ed. 888 (1806).
 
 
 17
 If a shipment is short, the mate should note the discrepancy on the mate's receipt before presenting it to the shipper. J. Bes, Chartering & Shipping Terms (1970). Pittston's own expert witness, a former mate, testified that a mate would not casually give a receipt and at the time of issuance has no interest in misrepresenting what has been loaded. See V Wigmore 1527. The ship's witnesses established that such receipts are issued in the usual course of the shipping business and that these were so issued; they were, therefore, admissible. See V Wigmore 1522.
 
 
 18
 By holding the bills of lading to be prima facie evidence under COGSA of receipt of the goods, the court below may have accorded them too much weight, but the finding that the bags of gum were delivered to the ship was not plainly erroneous. Proof of delivery was confirmed not only by the manifest and the mate's receipts but also by the stevedore's failure to notice any shortages. The discharge plan was based on the manifest, which listed complete shipments, and the longshoremen who unloaded the ship did not report any absence of cargo in any of the consignments. This indicates that the loss occurred after discharge, because the stevedore should have noticed the substantial cargo shortages it now claims.
 
 
 19
 Pittston admits it never counted the bags received and never knew how many bags it had until three months after discharge, but it seeks to escape liability entirely on the grounds that the ship did not ask for an accounting. Unless stipulated in the stevedoring contract, stevedores customarily do not tally goods during unloading in the Port of New York. When goods are pilferable, perishable, or particularly valuable, carriers ask for such a tally and this increases the cost of the contract. Pittston states that because the Concordia Viking did not request and pay for a tally, the ship assumed the risk of short shipments.
 
 
 20
 But the failure of the ship to request a discharge tally does not excuse Pittston, as a bailee, from counting the cargo once it was sorted out on the pier, and cannot imply a contractual assumption of risk on the part of the carrier for all 'mysterious disappearances' of cargo while in the hands of the stevedore/terminal operator. Schnitzer Steel Products v. American President Lines Ltd. and International Operating Co., Inc. v. Sullivan Security Services, Inc., 1972 A.M.C. 2617 (Sprm Crt N.Y. Cty 1972). Such an assumption of risk would relieve the stevedore of its duty to use reasonable care in handling the goods, but an exception of this kind departing, as it does, from the normal negligence standard, cannot be implied in a contract; it must be expressly stated. David Crystal, Inc. v. Cunard Steam-Ship Company, supra. If Pittston refuses to count the goods it receives, it cannot complain when it is held to have custody on the basis of a ship's tally.
 
 
 21
 'In holding the stevedore liable though it is not negligent, the courts have frequently stated that as between the shipper and the stevedore the liability should fall upon the party best situated to adopt preventitive measures and thereby reduce the likelihood of injury.' Doak, supra, 45 Tul.L.Rev. at 757. In David Crystal, supra, this court said, 'the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions.' 339 F.2d at 298. This applies equally well to mysterious disappearances of cargo in the custody of the stevedore/terminal operator.
 
 
 22
 Judgment affirmed.
 
 
 
 [1]
 This warranty, of course, can be limited or superseded by an express provision in the stevedoring contract. See David Crystal, Inc. v. Cunard Steam-Ship Co. Ltd., 339 F.2d 295, 300 and 302 (2 Cir. 1964); Moore, 'Liability of Stevedores for Cargo Damage Under United States and British Law,' Handelshogskolan i Goteborg, Skrifter (1961-62). There was no such limitation in the contract in this case
 
 
 [2]
 Although the district court in A. C. Israel Commodity Co., Inc. v. Lavino Shipping Co., 1968 A.M.C. 139, 141 (E.D.Penn.1967), interpreted COGSA to allow admission of the bills to prove receipt by the ship, the Third Circuit did not reach this argument on appeal and merely stated in a footnote that proof of receipt was not really in issue. 397 F.2d 170, 171-172 n. 3
 
 
 [3]
 In Louisville & Nashville Railroad Co. v. Knox Homes Corp., 343 F.2d 887 (5 Cir. 1965), the Fifth Circuit reversed a district court which had not allowed a carrier to introduce its own Freight Waybills to prove the weight of the cargo, and held that these business records 'were not only admissible, but they were enough to carry the day.' At 895. See also Olender v. United States, 237 F.2d 859, 866 (9 Cir. 1956), cert. den., 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957)
 
 
 [4]
 Damage reports made by stevedores 'acting as an agent or contractor' of the ship have been held admissible as business records when introduced by the ship against the shipper. Knofort, S.A. v. The S.S. Santo Cero, 190 F.Supp. 1, 9 (S.D.N.Y.1960)
 
 
 [5]
 Admiralty courts have historically faced problems of proof resulting from geographic distance from the event, and, consequently, have adopted rules of evidence which are not as restrictive as the common law rules, especially in relation to the admissibility of documents customarily used in the trade. The Spica, 289 F. 436 (2 Cir. 1923); Westchester Fire Ins. Co. v. Buffalo Housewrecking & Salvage Co., 40 F.Supp. 378 (W.D.N.Y.1941), aff'd 129 F.2d 319 (2 Cir. 1942); The Denny, 127 F.2d 404 (3 Cir. 1942); I Wigmore 4d