PEARSON, Judge.
This appeal is from a final judgment for Topp Electronics, Inc, the plaintiff in the court below. The appellants, Swedish East Asia Company, Ltd, Ocean Steamship Company, Ltd, China Steamship Navigation Company, Ltd, together constituted the Blue Sea Line for the transactions involved on this appeal. (We will refer to them as the defendant Blue Sea Line.) The action was for failure to deliver goods, according to the bills of lading, shipped from various Asian ports.
The parties, other than Topp, are as follows: Fireman’s Fund Insurance Company is Topp’s insurer and is subrogated to Topp’s rights. Harrington & Co. was the stevedoring company that unloaded the *654 shipments. Land Trucking Company was the land carrier.
Judgment was entered for Topp against Blue Sea Line after a trial before the court without jury. Blue Sea Line has appealed the judgment. Topp has cross-appealed, assigning as error the judgments for defendants Harrington and Land. Harrington has cross-assigned as error the order dismissing it without prejudice as to any claim of Blue Sea Line against it.
The trial was almost without any live testimony. The evidence was entirely documentary and was introduced upon the testimony of the office manager of the plaintiff, Topp. The evidence consists of bills of lading, packing slips, invoices and incoming warehouse shipment documents.
The theory asserted by Topp is that a prima facie case is established by a shipper against an ocean carrier and its agents by showing a clean bill of lading and proof that it did not receive the merchandise. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); Stein Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287, 1974 American Maritime Cases 275 (2d Cir. 1974); The Titania, 131 F. 229 (2d Cir. 1904).
The subject matter of this appeal involves fifty-eight shipments of radios, tape recorders, phonographs and other miscellaneous electronic products manufactured in the Far East for Topp Electronics, a distributing company with its principal warehousing and office facilities in Miami, Florida. The great majority of these shipments left Far Eastern ports (principally Hong Kong and Yokohama) for Miami during July and August, 1971, aboard eleven sea carriers chartered or owned by Blue Sea Line. Clean bills of lading for all shipments were issued by Blue Sea Line naming Topp in Miami as consignee.
Upon arrival of the vessels at the Port of Miami, Harrington performed the steve-doring functions of unloading from the ships the merchandise reflected in the fifty-eight bills of lading. Land Trucking was the common carrier dispatched by Topp to the Port of Miami to pick up the merchandise reflected in the fifty-eight bills of lading for delivery to Topp’s warehouse.
When Topp received the merchandise at its Miami warehouse, it accounted for every carton described in every bill of lading issued by Blue Sea Line. It accomplished this through the use of “Warehouse Incoming Shipments” documents, each of which directly corresponded to a particular bill of lading, and included references to the name of the manufacturer of the product, name of the vessel, bill of lading number, and number of cartons on the bill of lading. Each such document contained 500 numbered boxes, each corresponding with an actual carton number reflected on the bill of lading. “Total cartons received” were then noted just below “Total cartons on B/L” (bill of lading). The specific cartons missing (pilferage) were noted in a box for “remarks and/or exceptions.”
When the bills of lading were issued in the Far East, Topp also was sent packing slips and invoices from the manufacturers, which directly corresponded to the bills of lading. These were all received by Topp within a few days of the loading of the ship. After matching the bills of lading with the invoices and packing slips, the “Warehouse Incoming Shipments” documents were prepared. The shipments would arrive in Miami a few weeks later.
When the fifty-eight shipments arrived at Topp’s warehouse, after handling by Blue Sea Line, Harrington and Land Trucking, it was determined by the above-described procedure that shortages existed as to fifty-six of the shipments.
Blue Sea Line and Harrington have each presented a point urging that the evidence was insufficient and that proof of shortage upon delivery to Topp’s warehouse is not proof that Topp did not receive the mer *655 chandise inasmuch as the merchandise was delivered at the dock to Topp’s agent, the land carrier, Land Trucking Company. In the words of Topp’s manager and only witness, the difficulty arises because:
^ ‡ * * ‡ *
“THE WITNESS: It was a mess. At this particular time it was the most unholy mess down at the piers that we ever went through, and I have been doing this eleven years at Topp’s and prior to that with another company, but this was the worst because of the impending strike, and we had to get the merchandise off the pier before the strike hit, because this was Christmas merchandise. As far as we were concerned — and we were pushing the trucking company and the steamship company to get it to us and get it off the pier.
* * * * * *
“MR. HERMELEE: The problem there, Your Honor, is that Land’s bill of lading used different quantums of measurement than Harrington’s. In many instances Land refers to its delivery as pallet. A pallet is, as you know, a platform of wood. It can have anywhere from six cartons to seventy cartons on it. Harrington is dealing in numbers of cartons always. If Land were also dealing in numbers of cartons, theoretically we can add up everybody’s number, but they were not using carton numbers.”
% ‡ * ‡ ‡ 5fc
A shortage of goods may be proved against a sea carrier when the shipper makes a showing of delivery in good order and outturn by the vessel in damaged condition. The documentary evidence here shows the delivery but not the outturn by the vessel in a damaged condition. The only evidence of the shortages is by count at Topp’s warehouse after another carrier, Land, had accepted delivery and had, in turn, carried the goods. It is clear that no count of other than cartons was made by Land. Therefore, it is not established that the sea carrier is responsible for damaged cartons.
In a multi-carrier shipment, the shipper may hold all carriers liable for proved shortages and the last carrier is liable until it proves delivery to it in the damaged condition. See Savannah, F. & W. Ry. Co. v. Harris, 26 Fla. 148, 7 So. 544 (1890); and Atlantic Coast Line R. Co. v. Hinely-Stephens Co., 64 Fla. 175, 60 So. 749 (1912). Therefore, under the bare facts proved by Topp, it may be entitled to a judgment against all the carriers but not against Blue Sea Line alone.
Appellant’s point directed to the jurisdiction of the court is not well taken. See Milhet Caterers, Inc., v. North Western Meat, Inc., Fla.App.1966, 185 So.2d 196.
In view of our holding that the court applied an incorrect principle of law in arriving at the judgment, the cause must be returned for further consideration. Appellant’s remaining points and the cross-assignments need not be considered.
The cause is remanded for further consideration by the court in the light of our holding and with directions to take such further testimony as the court shall find material.
Reversed and remanded.
HENDRY, J., dissents.