**NATIONAL RESOURCES TRADING, INC. and Royal Insurance Company of America as the Subrogated Underwriter, Plaintiffs-Appellants,**

v.

**TRANS FREIGHT LINES [Maher Terminals, Inc.], Defendant-Appellee.**

No. 1500, Docket 84–7331.

United States Court of Appeals, Second Circuit.

Submitted March 1, 1985.

Decided June 24, 1985.

Donovan, Maloof, Walsh & Kennedy, New York City (John A.V. Nicoletti, Judith A. Machmer, New York City, of counsel), for Nat. Resources Trading, Inc. and Royal Ins. Co.

McHugh, Leonard & O'Connor, New York City, for Trans Freight Lines [Maher Terminals, Inc.].

Before FEINBERG, Chief Judge, LUMBARD and NEWMAN, Circuit Judges.

LUMBARD, Circuit Judge.

National Resources Trading, Inc., a New York corporation, and Royal Insurance Company of America, its underwriter and an Illinois corporation, appeal from a judgment of the Southern District which, on remand, again dismissed their claim against Maher Terminals, Inc., a New Jersey stevedore and terminal operator. We vacated the first judgment, which dismissed the complaint after a bench trial, and remanded for factual findings and conclusions of law as to whether Maher is liable, as a bailee, for the loss of 3712 pounds of molybdenum oxide in its possession. We retained jurisdiction. *Nat'l Resources Trading, Inc. v. Trans Freight Lines*, 751 F.2d 370 (2d Cir. 1984) (order vacating judgment and remanding).

On remand, Judge Lowe held that Maher was merely a gratuitous bailee so that, in the absence of proof of gross negligence, Maher was not liable for loss of the molybdenum oxide. We reverse and remand for entry of judgment for the plaintiffs, against Maher Terminals, for $67,558.40, plus interest from October 16, 1979.

On October 4, 1979, pursuant to its contract with Trans Freight Lines, Inc. ("TFL") to perform stevedoring and terminal services, Maher, at its Port Elizabeth, New Jersey facility, received an ocean container holding, among other cargo, 12,060 pounds of molybdenum oxide to be loaded upon the TFL Democracy. The molybdenum oxide, an alloying additive used in the manufacture of stainless steel, was owned by Union Resources, Inc., insured by Royal Insurance, and declared under a Royal cargo policy issued to National Resources Trading.[1] It was packed into 603 metal pails, each containing approximately 20 pounds of the grayish powder.

During the loading of the molybdenum oxide, at about 9:00 a.m. on October 5, 1979, the container in which it was encased collapsed, dumping its contents onto the stringpiece. The container collapse was due to design defects and corrosion not attributable to Maher. After the accident, Maher salvaged the cargo, removed the damaged container, and was subsequently paid by TFL for its one hour and 45 minute clean-up operation. The 603 pails, many of which had been damaged in the accident, were stacked on pier pallets and then taken to a Maher shed.

The pails remained in the Maher shed until October 16, when Gardiner's Express, Inc., a trucker retained by Union Resources, picked up the damaged pails for delivery to M & R Refractory Metals, Inc., at Winslow, New Jersey. The damaged shipment was released subject to a joint warehouse inspection, and was taken to M & R for reconditioning and repacking. It has been stipulated by the parties that no molybdenum oxide was lost during the inland movement from Maher's shed to the M & R facilities.

Upon arrival at the M & R plant, and at Union Resources's instructions, the molybdenum oxide was removed from its damaged packing and transferred to 55-gallon drums. On October 23, surveyors for Royal Insurance and TFL conducted a joint warehouse inspection. Upon weighing, it was discovered that the shipment contained only 8348 pounds of molybdenum oxide. Maher has stipulated that it received 12,060 pounds of the sandlike material, in a gross shipment of 22,876 pounds, and that the market value of the molybdenum oxide is $18.50 per pound, less 30 cents in reconditioning expenses.[2]

---

1. National Resources is a shareholder in Union. The molybdenum oxide was insured under a Royal policy by the terms of which National could insure shipments for its own account, or for the account of others. National declared the molybdenum oxide for the account of Union Resources and commenced this lawsuit as trustee and on behalf of Royal and Union.

2. National Resources brought this action against Scanfreight, Inc., the non-vessel carrier, Trans Freight Lines, Inc., the container supplier and ocean carrier, Maher, as stevedore, terminal operator, and salvor, and Uniflex Container Co.,

the container lessor. Scanfreight commenced a third-party action against the cargo consolidators, United Terminals, Inc. and Coast Transport, Inc., and Trans Freight brought a third-party action against Theurer, Inc., the container manufacturer.

Before trial, National Resources settled its claim with all defendants and third-party defendants except Maher. The settling parties agreed to pay for all charges associated with the contamination of the molybdenum oxide shipment, leaving only Maher's liability for the 3712-pound loss for determination at trial.

At the first trial, Judge Lowe determined that an unknown quantity of the molybdenum oxide spilled out of its packaging as a result of the accident on the stringpiece, but that this amount did not even approach the missing 3712 pounds. The court also concluded that Maher was not negligent in its salvage operation. Because the district court failed to address the plaintiffs' theory that Maher was liable, as a bailee, for the unexplained loss of material in its possession, we vacated the dismissal of plaintiffs' complaint and remanded. Since we now find that Maher was a bailee for hire and consequently liable, as a matter of law, absent an adequate explanation for loss of the molybdenum oxide, we direct judgment for the plaintiffs.

■ We note, preliminarily, that the complaint invokes only admiralty jurisdiction, unavailable with respect to National Resource's claim against Maher by virtue of this court's decision in *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808 (2d Cir.1971), which held that a shipper's claim against a terminal operator for loss of cargo is not within the federal maritime jurisdiction, but is a state claim governed by state law. *See also Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). In that same case, however, the court noted that pleadings in admiralty have traditionally been read with liberality, and went on to invoke pendent jurisdiction over the shipper's claim against the terminal operator, even in the absence of an allegation of such jurisdiction in the complaint. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d at 809–11. Giving due regard to considerations of judicial economy, we conclude that it was within the court's discretion to exercise its power to hear the claim against Maher under the doctrine of pendent jurisdiction. The claim is pendent to the admiralty claim against the carrier, which has been settled, and *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), has not foreclosed pendent party jurisdiction at least in circumstances where jurisdiction over the federal claim is exclusive. *See Weinberger v. Kendrick*, 698 F.2d 61, 76–77 (2d Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In deciding this pendent claim, the district court must apply New York law, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58

S.Ct. 817, 82 L.Ed. 1188 (1938), and this rule applies to conflicts law as well. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Few courts have considered the question of what law governs in an action on a bailment agreement where the case involves multi-state contacts. *See* Restatement (Second) of Conflicts of Laws § 191, comment i (1971). Under the circumstances of this case, we believe that a New York court would apply New Jersey law, since Maher is a New Jersey stevedore and terminal operator and since New Jersey is the place where the molybdenum oxide was delivered and stored and where the unexplained loss occurred. *See Nat'l Dairy Prods. Corp. v. Lawrence Am. Field Warehousing Corp.*, 22 A.D.2d 420, 429, 255 N.Y.S.2d 788, 798 (App.Div.), *rev'd on other grounds*, 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965).

■ In *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d at 317 we concluded that, while the Supreme Court of New Jersey has never squarely addressed the issue, it is apparently New Jersey law that a warehouse that fails to come forward with an adequate explanation for its failure to return stored property is liable for conversion, even absent proof of negligence. N.J.Stat.Ann. § 12A:7–102(1)(h) (1962) defines a warehouseman as "a person engaged in the business of storing goods for hire." On this record, we conclude that Maher stored the molybdenum oxide as a warehouseman for TFL.

The container holding the molybdenum oxide was delivered to Maher the day before it was to be loaded aboard the TFL ship. After the accident, the pails of molybdenum oxide were stored in Maher's shed for over one week. Construing the relevant provisions of their contract, we conclude that Maher's responsibility for storage during such periods of time is contained in the agreement between Trans Freight Lines and Maher Terminals.

■ The October 1, 1978 contract, which states that it will continue for an indefinite period of time, provides for Maher's performance of stevedoring and terminal services. Section 6 of this contract expressly states that Maher may charge demurrage for the storage of loose cargo or full containers, after the lapse of a period of free time—in this instance, the 10

days, exclusive of weekends and holidays, set out in the New York Terminal Conference Tariff. This provision for a period of time in which to pick up cargo at the dock accrues to the benefit of the shipper, and is part of the transportation service of the carrier—here, TFL. *Am. President Lines v. Fed. Maritime Bd.*, 317 F.2d 887, 888 (D.C.Cir.1962). Thus, even though the shipment was released prior to the expiration of the Terminal Conference Tariff's 10-day period, Maher warehoused the damaged molybdenum oxide as an agent for TFL and pursuant to the compensated arrangement between it and the carrier. Maher's duties under its contract with TFL, of course, run to the benefit of the plaintiffs here. *Stein Hall & Co. v. S/S Concordia Viking*, 494 F.2d 287, 290 (2d Cir.1974).

■ We do not agree with Maher's contention that, upon the breaking apart of the container, the contract between TFL and Maher was dissolved, and Maher became a mere gratuitous bailee of the damaged cargo. By admittedly storing the molybdenum oxide under the contract, albeit with the first 10 days free to the shipper, Maher was acting pursuant to an ongoing and compensated arrangement between it and the carrier.[3] Indeed, Maher noted as much when it released the cargo to Gardiner's Express as an agent for TFL by stating, on the tally sheet, that the 603 pails were delivered "[s]ubject to a w/h [warehouse] exam, TFL to be notified of time and place."[4] Because Maher had the right to recover from TFL for its care of the molybdenum oxide shipment, we conclude that the stevedore and terminal operator was a bailee for hire.

■ Maher, argues, however, that even assuming that it was a compensated bailee, it has overcome the presumption of negligence that arises against a bailee for hire who does not account for goods in its possession. First, Maher asserts that the nature of the accident on October 5 was sufficient to overcome Maher's evidentiary burden and to explain a loss. Second, Maher argues that the removal of the molybdenum oxide into gallon drums at the M & R plant prevented verification of the amount of molybdenum oxide delivered to Gardiner's Express, and so destroyed the presumption, based, as it is, on the premise that the bailee is in the best position to explain loss of property in its possession. *See Reinfeld, Inc. v. Griswold & Bateman Warehouse Co.*, 189 N.J.Super. 141, 458 A.2d 1341 (1983).

In the first trial, however, the district court did not credit testimony that even as much as four to six hundred pounds of molybdenum oxide had spilled during the accident. Indeed, the district court credited the testimony of Maher employees who indicated that the spillage of molybdenum oxide was so slight that the stevedores did not even need brooms or shovels to remove the powdery substance. Though the court, on remand, indicated that "there was necessarily a loss that occurred and nobody knows how much because of the accident," we cannot see anything in this record to suggest that the occurrence of the accident can account for the disappearance of over 3700 pounds of molybdenum oxide. We therefore conclude that Maher has not satisfied its duty to come forward with an explanation for loss of material in its possession.

We also disagree with Maher's contention that the removal of the molybdenum oxide into secure drums at the M & R plant relieves the stevedore and terminal operator of its duty to explain. Frank Christiansen, a marine surveyor employed by Trans Freight Lines to survey the scene of the

---

**3.** At any rate, and though the parties do not argue the point, we note that the contract provides for compensation to Maher even in the event of termination or unforeseen incidents disrupting the normal flow of cargo at the terminal. Thus, § 15 states:

... If there is a period of inactivity, then the CARRIER shall consider to pay its proportionate and reasonable share of the cost of any services and/or facilities provided to the CARRIER by the CONTRACTOR during any such period of enforced inactivity.

Even were we to conclude that the contract was at an end, at the breaking apart of the container, § 19 provides that upon termination and at TFL's option, Maher will continue to be responsible for the discharge and warehousing of cargo in transit. Section 19 expressly states that Maher "will receive payment for these services as specified in this Agreement."

**4.** In § 4 of its agreement with TFL, Maher contracts to "[s]ign dock receipts in the name of the CARRIER and as agent for CARRIER for cargo received and to secure signatures for cargo delivered to consignees, their agents, servants, employees and carriers with appropriate notations of exceptions."

accident, testified, at the first trial, that "quite a few" of the small pails containing the molybdenum oxide had broken open and were dented and crushed, as a result of the accident. When he later observed approximately 10 percent of the shipment in the Maher shed, Christensen found that most of the cans were dented, some with the tops missing and contents exposed. This testimony, which explains the necessity for removing the oxide powder into safe containers, was credited by the district court.

The surveyors employed by TFL and Royal Insurance agreed to transport the molybdenum oxide to the M & R plant to assay the material, in order to determine the extent of contamination. Though Christiansen testified that cargo normally remains in its original condition, prior to joint warehouse examination, the surveyors made no arrangements to insure that the molybdenum oxide would be kept in its damaged containers upon arrival at M & R, and we find no basis for ascribing to them a duty to do so. According to the report of Royal's surveyor, the molybdenum oxide was emptied into steel drums at M & R to blend the material, in order to assess the degree of contamination and, more important, to minimize loss. The surveyor reported that many of the damaged containers exposed the powder to contamination by dirt or damp.

Christiansen stated, in his report, that he advised Royal's surveyor to attempt to have the molybdenum oxide weighed at the pier, to prevent later weight discrepancies. Maher now contends that it lacks the facilities accurately to weigh less than full-load oceanbound containers. Be that as it may, the responsibility for taking precautions in the discharge of bailed materials rested with neither the shipper and its underwriters, nor the surveyors. It remained, instead, with Maher. Just as the stevedore and terminal operator must account for goods on the basis of a ship's tally, where it fails to count bags that it receives, *see Stein Hall & Co. v. S.S. Concordia Viking*, 494 F.2d at 293, Maher must come forward with an explanation for the 3712-pound shortfall discovered at M & R, where it neglected either to provide for the weighing of the damaged shipment before release to Gardiner's Express or expressly to condition its liability upon a joint survey to be conducted prior to the securing of the molybdenum oxide in undamaged containers. Union Resources's reasonable safeguarding of the material upon arrival at the M & R plant does not relieve the stevedore and terminal operator of its duty to employ procedures that would have minimized the possibility of unexplained loss. *Id.*

Because Maher is a warehouseman under New Jersey law, and because it failed to explain the disappearance of 3712 pounds of molybdenum oxide in its possession, Maher is liable for conversion of the missing cargo. The judgment is reversed and the cause is remanded with instructions to enter judgment for the plaintiffs in the amount of $67,558.40, with interest from October 16, 1979, the date upon which the molybdenum oxide was turned over to Gardiner's Express, an agent for the plaintiffs herein.