**JOHNSON PRODUCTS CO., INC., and Johnson Products of Nigeria, Ltd., Plaintiffs,**

v.

**M/V LA MOLINERA, her engines, boilers, etc., in rem; Caribbean Bulk Carriers, Ltd., International Customs Service, Inc., and Nigerian Star Line, in personam, Defendants.**

No. 85 Civ. 371 (JEL).

United States District Court, S.D. New York.

Jan. 10, 1986.

Thacher, Proffitt & Wood, New York City, for defendant Nigerian Star Line; Thomas S. Howard, Dwight B. Demeritt, Jr., Michael J. Dowd, of counsel.

Marvin Eschen, Jericho, Long Island, N.Y., for defendant Intern. Customs Service, Inc.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs; Thomas F. Molanphy, Mary P. Gallagher, of counsel.

\* Sitting by designation.

LUMBARD, Circuit Judge:\*

Johnson Products, Inc. ("Johnson Products") and Johnson Products of Nigeria, Ltd. ("JPN") sue International Customs Service, Inc. ("ICS") and Nigerian Star Line ("NSL") for the expenses and damages incurred by Johnson Products in securing the release of a shipment to JPN of raw materials used in the making of the hair product "Afro-Sheen," which shipment was arranged by ICS and carried by NSL. The plaintiffs' claims against NSL, the carrier, come within the Court's admiralty jurisdiction. *See* 28 U.S.C. § 1333. The plaintiffs' claims against freight forwarder ICS, which allege fraud and negligence in acts performed on land, are not within the Court's admiralty jurisdiction. However, because Johnson Products is an Illinois corporation with its principal place of business in that state, ICS is a California corporation with California as its principal place of business, and NSL is a Nigerian corporation with its principal place of business in Nigeria, diversity jurisdiction exists under 28 U.S.C. § 1332.[1] The Court has exer-

1. The presence in this action of JPN and of NSL, both of which are Nigerian corporations, does not destroy the complete diversity necessary for federal subject matter jurisdiction in the action against ICS. *See Romero v. International Terminal Operating Co.*, 358 U.S. 354, 381, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959). Because the action against NSL is within the court's admiralty jurisdiction, it provides an independent source of federal jurisdiction, and therefore has no effect on the completeness of diversity. *Id.* This view comports both with the venerable rule in *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806), 2 L.Ed. 435, and with principles of judicial economy. The court has determined that all of Johnson Products' claims should be heard in a single forum, and it would serve no logical purpose to require the plaintiffs to bring their two federal actions separately merely because they proceed from different founts of jurisdiction.

Furthermore, although none of the parties has suggested it, the court notes that the action against ICS, which was originally dismissed for failure to state a claim in admiralty and repleaded to state a claim in diversity, could nonetheless have been joined to the action against NSL by virtue of pendent party jurisdiction. The actions against the two defendants stem

cised its discretion to hear all of plaintiffs' claims in a single forum. *See* 619 F.Supp. 764 (S.D.N.Y.1985) (dismissing claim against ICS for lack of admiralty jurisdiction but allowing leave to amend complaint to assert diversity jurisdiction); *see also* Wright & Miller, *Federal Practice and Procedure,* § 1314, at 455 (1st ed. 1969).

The court finds that ICS breached its fiduciary duty to Johnson Products as freight forwarder, and therefore is liable in the amount of the freight payment that Johnson Products made to NSL to secure release of the shipment in Nigeria. The court also finds, however, that the plaintiffs failed to mitigate their damages, and as a result, the recovery must be limited to reimbursement for what turned out to be a second ocean freight payment. If Johnson Products had monitored the status of the cargo after discovering that NSL had never received the initial freight payment, it would have avoided the additional expenses it seeks to charge to the defendants. The court finds that NSL is without blame or liability in this matter.

Most of the relevant facts are undisputed. On December 15, 1983, Johnson Products' Traffic Manager, Loretta Dennys, telephoned Shelley Douglas of ICS to see whether ICS could arrange for a house-to-house shipment of 25 to 30 forty-foot containers from Johnson Products' Chicago plant to Lagos, Nigeria, to sail from the United States prior to the end of December. The shipment consisted of raw materials used in the making of Afro-Sheen, ordered by JPN, Johnson Products' Nigerian affiliate. The speed with which the goods were to be placed on a ship was important because Johnson Products' Letter of Credit was due to expire at the end of 1983. Johnson Products had acquired this Letter, along with the other requisite documentation, in the preceding months.

Later that day, Douglas called Dennys to tell her that a ship was available and that ICS could arrange for carriage at the rate of $5,500 per container. ICS did not identify the vessel or the carrier, but told Dennys that the ship would be sailing to Nigeria before the end of the month. After Dennys received the go-ahead from her supervisor, Robert Johnson, she called Douglas back the same day to accept ICS's proposal. ICS was to provide the containers for shipment, which Dennys requested be delivered to Johnson Products' warehouse by the following Monday, December 19; in this way Johnson Products would be able to finish filling the containers before it closed for the holidays on December 23. Although Douglas assured Dennys that the containers would arrive by December 19, only six or seven of the 25 necessary containers had arrived by that date.

On December 20, Dennys called ICS to find out when the rest of the containers would arrive. Douglas offered Dennys the alternative of loading the shipment into containers other than those necessary for the actual shipment, with subsequent transfer into the proper containers, at ICS's expense. Dennys's supervisor, Robert Johnson, rejected this alternative as contrary to his policy of in-house loadings for all of Johnson Products' shipments. Johnson agreed to wait several more days for the proper containers, which ICS said it would provide by December 23, 1983. The containers were finally packed and removed from Johnson Products' premises by the morning of Monday, December 26.

Johnson Products re-opened after the holidays on January 2, 1984, and Dennys called ICS to confirm that the vessel had sailed. ICS assured her that everything was in order. Dennys did not inquire about, nor was she told, the identity of the vessel or the carrier. On January 5, Johnson Products received from ICS an invoice for the shipment and a bill of lading. The bill of lading was on the form of Container Overseas Agency, Inc. ("COSA"), and

from a common nucleus of operative facts, and it would therefore be within the court's discretion to join the claims in a single forum. *See National Resources Trading, Inc. v. Trans Freight*

*Lines,* 766 F.2d 65 (2d Cir.1985); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800 (2d Cir. 1971).

showed Johnson Products for the first time that ICS had used a non-vessel-operating common-carrier ("NVOCC"), i.e. COSA, as an intermediary between itself and the carrier. The bill of lading also stated that the freight had been pre-paid, and that the goods had been on board the vessel Nurenburg Express as of December 29, 1983. Based on the normal time schedule for the trip, the goods would be expected to arrive in Lagos by January 17, 1984. In the invoice sent along with the bill of lading, ICS charged Johnson Products $145,209.54 for ocean freight and for the other services it performed in connection with the shipment. Johnson Products approved payment of this invoice by check dated January 13, 1984. ICS deposited the check on January 19, 1984.

David Sharpe, the head of ICS's Chicago office, testified that it was around this time that ICS first discovered that COSA had not sent the shipment on the Nurenburg Express, as promised, and that, contrary to Johnson Products' instructions, the bulk of the shipment had been transferred to different containers. A May 23, 1984, ICS interoffice memorandum sent by Shelley Douglas shows, however, that ICS knew in mid-December, 1983, that the goods were going to sail late and were not going to be loaded as Johnson Products had requested, and further that ICS and COSA had agreed to conceal this fact from Johnson Products. Douglas's entry for December 20, 1983 states:

"We also realized we would not make the December 30th sailing but Meyers said they would still give us 12/30 on board and would get the containers to sail early January."

Douglas's entries for the December 21–23 period continue:

"Confirmed cross-loading situation with Dave Sharpe and Tom Thorpe—of our office—who agreed we would not say anything to Johnson Products about cross-loading and late sailing."

Thus, contrary to Sharpe's testimony, ICS knew by mid-January at the latest that the goods had not sailed on the Nurenburg

Express, and had not left the country before the end of December; and that the COSA bill of lading it had passed on to Johnson Products was false. Despite this knowledge, ICS never informed Johnson Products what had happened, and that the shipment would not arrive in Lagos until the second week of February, 1984.

Also by mid-January, ICS had reason to believe that COSA was in financial trouble. First, the truckers who had performed the inland carriage of the goods requested payment from ICS. Although the truckers had been hired by COSA, they told ICS that they preferred direct payment because of uncertainty as to COSA's financial stability. ICS consulted with COSA and paid the truckers, later deducting the amount from its subsequent payment to COSA. Second, ICS learned that in early January COSA had received the resignations of its president and of one of its principal salesmen. Finally, COSA asked ICS for an additional $7500 fee for "war risk insurance" and "currency fluctuation," and when ICS balked at paying the extra charge, COSA threatened to hold up shipments for other ICS clients.

Despite all these indications of COSA's financial difficulties, ICS still went ahead and passed on to COSA the freight money that Johnson Products had paid it, less ICS's fee. The evidence shows that, although ICS had deposited Johnson Products' check on January 19, 1984, and had made out its check to COSA on January 31, it did not in fact make payment to COSA until February 10, which was after the freight had arrived in Lagos. It is not clear whether ICS delayed because of diffidence, or consciously because of doubts about COSA's solvency, but in any event ICS did make the payment with reason to know that COSA was in financial trouble and without having disclosed this trouble to the plaintiffs. The delay apparently may have arisen because of discussions ICS was having with respect to other shipments for other clients.

Plaintiffs' expert witness, Bernard Leyden, testified that ICS had the alternative

of arranging for direct payment to the carrier, and that a responsible freight forwarder would have done so in light of the shipment's size and the false bills of lading, even without specific knowledge—such as ICS had—of COSA's financial difficulties. Because of COSA's subsequent bankruptcy, COSA never paid the ocean freight to the actual carrier, NSL, and Johnson Products had to make the payment itself in order to obtain its goods.

Sometime in late December, 1983, or early January, 1984, COSA approached NSL's New York agent, Zim, to arrange for the shipment of the 25 containers to Lagos aboard the La Molinera. In mid-January, COSA provided NSL with bills of lading that it had typed on NSL's blank form.[2] The bills of lading were stamped "freight to be prepaid," which meant that the cargo could not be released until the shipper presented the original bills of lading, which it would receive upon payment in full. NSL never inquired as to the identity of the original shipper, and relied solely upon its contacts with COSA, who, as NVOCC, operated as an intermediary between NSL and ICS.

On January 20, 1984, NSL loaded the 25 sealed containers aboard the M/V La Molinera in Baltimore. Several days after the La Molinera sailed, on about January 24, NSL contacted COSA to inquire when the freight would be paid. COSA said it had "a problem with its shipper," but assured NSL that the freight would be paid. At the end of January, Zim's employee Ted Kaplan observed that COSA had not yet paid the ocean freight owed to NSL. He sent a precautionary telex to Lagos and Niger Shipping Agency, Ltd. ("LANSAL"), NSL's Nigerian agent, notifying it that the freight had not been paid and reminding them not to release the cargo until it had. Kaplan then met with a COSA employee, who told him that COSA had in fact been paid but had already spent the money. NSL suggested that COSA try to pay in installments, and COSA subsequently prepared five bills of lading, on NSL's forms, that would document release of the goods in five equivalent installments. The original bills of lading were voided. NSL was not aware of, nor did it inquire as to, the identity of the original shipper.

On February 8, 1984, Allan Sym-Smith, Vice President of Johnson Products' International Division, who was in Lagos for a meeting of the JPN Board, called the Central Bank of Nigeria. The Central Bank was supposed to have received the bill of lading and other documentation for the shipment from the Continental Bank of Illinois which, in turn, was supposed to have received it from ICS. The Bank had not received the documents. Sym-Smith then contacted LANSAL, which he learned was supposed to receive the shipment, and they informed him that they would not release the goods because the ocean freight had not been paid. At the same time Sym-Smith learned that the goods had not been shipped on the Nurenburg Express, but he did not at that time inquire as to the amount of freight charges outstanding or as to the name of the vessel or carrier involved.

Sym-Smith called Dennys to tell her about the problem, and she checked with Johnson Products' International Department. After a short investigation, an employee of this department told her that the freight had not been paid and the ship was about to dock. She then contacted ICS to find out what was going on. Douglas told Dennys that the only unpaid money was the additional $7500 COSA had requested for war risk insurance and currency fluctuation. Whereas ICS alleges that it thought at this time that it had already paid COSA the freight, the other parties allege that ICS knew it had not and there-

---

2. The bills of lading erroneously stated that the shipment consisted of 25 containers of the finished product "Afro-Sheen." In fact, the containers contained raw materials to be used in the making of "Afro-Sheen"; this misstatement was important because Nigeria prohibits the importation of finished products. Although the error caused Johnson Products additional difficulty in clearing importation of the goods, it does not affect either of the defendants' liability because the court finds that it was COSA's fault.

fore was misleading Johnson Products when it said that the $7500 was the only amount due. The court finds that ICS was again deceiving Johnson Products by failing to disclose what had actually happened. At any rate, Sym-Smith was told that the extra $7500 payment should clear up the problem. No one at Johnson Products took any steps to verify ICS's statements, and on February 14 Johnson Products paid the $7500 charge to COSA, under protest. ICS refunded this payment in March, 1984.

Apparently spurred on by Johnson Products' inquiries on February 8 regarding the ocean freight payment, ICS went ahead and paid COSA by check on February 10, deducting its own commission and the trucking fee that it had already paid the truckers. The court finds that ICS made this payment with knowledge that COSA had provided Johnson Products with a falsified bill of lading, and with knowledge that COSA was in financial trouble. COSA never passed the freight money on to NSL. On February 11, 1984, the La Molinera arrived in Lagos. LANSAL, NSL's port agent, in exercise of NSL's carrier's lien, refused to release the cargo because the ocean freight payment had not been received.

So far as the evidence shows, from February 11, 1984, until late March, Johnson Products did nothing to monitor the status of its shipment. It knew that it would be allowed 21 days' free demurrage, which would last until approximately March 3. Finally, in late March, 1984, when Sym-Smith approached LANSAL again to obtain the 25 containers, he discovered that the ocean freight had not yet been paid. He then negotiated rent and demurrage charges with LANSAL, and tried to contact COSA about securing release of the cargo. When COSA proved unhelpful, Johnson Products contacted ICS. ICS called Kaplan (an employee of NSL's New York agent, Zim) to tell him that Johnson Products could not get its cargo in Nigeria because NSL had not given them the original bills of lading. NSL told ICS that COSA had never made the payment for the ocean freight. Sym-Smith then for the first time

discovered that the goods had been shipped on the La Molinera, and that NSL had been the carrier.

Kaplan told Sym-Smith that Johnson Products could obtain the bills of lading from NSL by paying the ocean freight directly to NSL, subject to named shipper COSA's approval. This approval having been received by telex, Johnson Products' Vice President and General Corporate Counsel Marilyn Cason travelled to New York and, on April 2, 1984, paid the $111,000 freight to Zim for NSL's account. In return, she received the five substitute bills of lading that would allow release of the cargo; she sent them to Lagos, and they were presented to LANSAL for release of the goods. In the meantime, Kaplan had telexed LANSAL to inform them that the goods could soon be released. After more delay, which was partially caused by the misdescription of the goods as "finished products," the goods were finally released to Johnson Products on April 11, 1984.

Plaintiffs, in January, 1985, brought this action for damages incurred by the second freight payment and by delay in release of the goods, against ICS and NSL, as well as the ship La Molinera and her owner, Caribbean Bulk Carriers, Ltd. The action against the ship and her owner was subsequently discontinued without prejudice. Meanwhile, on April 27, 1984, COSA had filed for bankruptcy.

■ Johnson Products argues that ICS breached its duty as a freight forwarder by negligently paying the freight charge to COSA upon a false bill of lading and with knowledge of COSA's financial problems. The plaintiffs argue, first, that ICS's culpability is demonstrated by analogy to the standards imposed on freight forwarders by provisions of two maritime acts: 1) the Pomerene Act, 49 U.S.C. App. § 121 (1982 & Supp. I 1983), which imposes criminal sanctions upon anyone who transfers a false bill of lading, and 2) the Shipping Act, 46 U.S.C. § 841b(b) (1982 & Supp. I 1983), and the regulations promulgated thereunder, which direct licensees to impart all

correct information regarding a forwarding transaction to their principals. Plaintiffs acknowledge that this is not an action to enforce either of the provisions they have cited; they merely invoke them for analogous support. Because the court finds that ICS has breached its common-law duty as freight forwarder and fiduciary of Johnson Products, it need not address the question of whether ICS has violated any provision of maritime legislation.

The relationship between a shipper and a freight forwarder is "fiduciary" and of "the greatest trust and fidelity." *United States v. Ventura*, 724 F.2d 305, 311 (2d Cir.1983). ICS, as the agent of Johnson Products, had a duty to take care in arranging and supervising the transport of the cargo. *See Knudsen v. Torrington Co.*, 254 F.2d 283, 286 (2d Cir.1958) (noting that the agency relationship "implies a promise to use care and skill and imposes fiduciary obligations of loyalty and obedience not normally present in other bilateral agreements"). Instead, the question is whether ICS should have acted, in its fiduciary capacity, to shield Johnson Products from loss due to COSA's financial difficulties. The court concludes that ICS could and should have so acted, but failed to—either because of conflicting interests arising out of its relationship with COSA, or because of negligence. In either case, however, ICS cannot escape liability. *See Ingersoll Milling Machine Co. v. M/V Bodena*, 619 F.Supp. 493 (S.D.N.Y., 1985) (holding freight forwarder liable to shipper because of negligence in supervising transport of cargo); *A.P. Moller S.S. Co. v. Bromhead & Dennison Ltd.*, 1982 A.M.C. 1455 (S.D.Tex.1981) (same), *aff'd*, 1983 A.M.C. 2791, 692 F.2d 755 (5th Cir.1982); *United States v. Cargo Export Corp.*, 675 F.2d 511, 1982 A.M.C. 2011 (2d Cir.1982) (holding freight forwarder liable to shipper because of fraud in inducing and supervising shipment).

ICS breached its fiduciary duty to Johnson Products by knowingly forwarding to them false information regarding the vessel carrying the cargo, the manner of lading, and the sailing date. The Douglas memo showed that ICS knew of this falsity when it originally induced Johnson Products to enter into the carriage agreement; even if, as ICS alleges, it only discovered that COSA's bill of lading was false in mid-January, 1984, ICS nevertheless breached its duty by failing to pass on this material information to Johnson Products. ICS again misled Johnson Products when it stated in early February that the only payment needed to secure release of the freight was the additional $7,500 that COSA had demanded. This was a conscious deception designed to conceal ICS's delay in making the freight payment to COSA, which delay in turn may have resulted from ICS's relationship with COSA and its own fears as to COSA's solvency.

In any event, ICS further breached its obligations when it went ahead and passed on to COSA the freight money that Johnson Products had paid ICS. ICS was on notice that COSA was in extreme financial difficulty, and indeed had been subjected to COSA's attempt to extort an additional $7,500, but nevertheless ICS entrusted COSA with a $111,000 cash payment. ICS never considered paying the freight directly to NSL and thus avoiding the danger of putting cash into COSA's shaky hands. It appears to the court that ICS paid COSA because the two companies were working in concert and ICS desired to protect its other shipments under COSA's control. *Cf. Cargo Export, supra*, 675 F.2d at 512, 1982 A.M.C. at 2013 (charging fraudulent freight forwarder with NVOCC's failure to pass on freight payment). Even if ICS had paid COSA in the good faith belief that the money would be safe, its actions would still amount to a negligent breach of its duty of care. *Cf. A.P. Moller, supra* (holding freight forwarder liable for failing to live up to its "expertise or at least represented expertise"). Plaintiffs' expert witness testified, and the court agrees, that in light of the facts known to ICS by February 10, its payment of the freight to COSA was "inconceivable." ICS simply breached its fiduciary duty to Johnson Products, and it must be held accountable for plaintiffs'

having to pay additional freight of $111,-000.

ICS argues that Clause 8, on the reverse side of its invoice sent to Johnson Products on January 5, 1984, limits its liability to $50 per shipment. It seems unlikely that such a provision could apply where the liability arises from fraud on the part of the freight forwarder, but in any event, ICS offered no evidence to show that Johnson Products was familiar with and assented to the provision, and therefore Johnson Products cannot be bound by it. *See, e.g., Tankers & Tramps Corp. v. Tugs Jane McAllister and Margaret M. McAllister,* 358 F.2d 896, 899–900 (2d Cir.1966) (declining to enforce tug-owners' limitation of liability clause), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Ingersoll, supra* (declining to enforce freight forwarder's clause). In the absence of a clear and well-known industry practice limiting freight forwarders' liability, ICS's Clause 8 reduces to a "fine print clause[] contained in [a] standardized contract form[]," *Allstate Insurance Co. v. International Shipping Corp.,* 703 F.2d 497, 500 (11th Cir.1983), which courts generally construe against the drafter, *see Bernard Screen Printing Corp. v. Meyer Lowe,* 464 F.2d 934 (2d Cir.1972).

■ Having found that plaintiffs may recover from ICS for the second payment of the ocean freight, the Court now turns to plaintiffs' claims for additional expenses incurred while the goods were being held in Lagos by LANSAL. The Court finds that plaintiffs failed to take the steps necessary to mitigate their losses by avoiding these additional expenses, and therefore their damage recovery must be limited to the $111,000 payment for the second freight. Johnson Products was informed on February 8, 1984, that the basic freight charge had not been paid and that the cargo had not been released. Nevertheless, it was not until late March, 1984, that plaintiffs took any serious steps to effect release of the cargo. Plaintiffs argue that their delay was caused by a reasonable reliance upon ICS's assertion, in early February, that the

only thing holding up release of the cargo was the $7,500 additional charge. Plaintiffs assert that they paid this amount in February and then reasonably expected the goods to be released.

Although it is true that the plaintiffs had the right to rely on the freight forwarder—and, indeed, ICS's liability upon the ocean freight is based in part upon this right—they nevertheless retain the common law and common sense obligation to monitor the status of their own goods. Assuming that plaintiffs did as an initial matter rely reasonably upon ICS's assertions as to the $7,500, there was no excuse to delay for almost two months while the cargo sat in a hold, accumulating charges. By February 8, officials of Johnson Products knew that they must take active meaures themselves to ensure release of the shipment without risking delays that would involve additional expense. Plaintiffs had free rent and demurrage from February 8 until March 3; if they had exercised due care by acting to secure release of the cargo within that time-period, no additional rent and demurrage charges would have accrued. Because plaintiffs did not so act, and in fact did not even begin to seek direct release of the goods until late March, their claim for $162,393 of extra storage and demurrage charges must be denied.

Plaintiffs also seek damages of $40,-232.50 for terminal and depot charges. The testimony of Sym-Smith, however, leaves some ambiguity as to whether these charges had anything to do with the delay that is the subject of this case, or whether they were normal charges. In any case, this claim must fail because it also stems from the plaintiffs' failure to act promptly in seeking release of their goods.

Plaintiffs further claim $98,069.94 in damages resulting from actions taken by their agent Olu Mose in supervising the release of the shipment. It is not clear which of these charges were normal charges and which were additional; and further the record does not even contain any proof of the payment of Mose's invoice. The court finds that, whatever the

damages may have amounted to, and whether or not the invoice was actually paid, the plaintiffs have failed to show sufficient causal connection between defendants' actions and the alleged damages.

Finally, plaintiffs seek $72,058.22 for salary and travel expenses incurred by Sym-Smith in connection with settling this matter. Again, plaintiffs' claim is insufficiently specific to demonstrate the requisite causal connection between the alleged harms and the resulting expenses. This may be due in part to Sym-Smith's failure to keep contemporaneous records of his time—he put the records together three months after the fact, and indeed if he had spent as much time on this matter as he claims to have done, it seems inexplicable that it took him almost two months to discover that the goods had not been released. The court finds insufficient causal connection between defendants' wrongs and plaintiffs' alleged time and travel expenses; the claim is denied.

■ The court finds no basis for any claim against NSL. NSL properly exercised its lien for unpaid freight on the shipment. NSL had issued its bills of lading, had earned its freight by carrying the goods to Lagos, and so could exercise its lien against the goods. The bills of lading so provide, and in any event such a lien accords with general maritime law. *See The Bird of Paradise,* 72 U.S. (5 Wall.) 545, 555, 18 L.Ed. 662 (1866); *see also* 49 U.S.C. app. § 88 (1982 & Supp. I 1983) (lien provision of the Pomerene Act).

Plaintiffs argue that NSL assumed the risk of COSA's failure to pay the freight by issuing a bill of lading marked "freight prepaid," without having received payment on the freight. The cases plaintiffs cite to support this supposed "general rule" are inapposite, however. In each case, a carrier sued its shipper to obtain its freight payment after it had issued *and released* "freight pre-paid" bills of lading to the freight forwarder in exchange for the forwarder's written acknowledgement of liability. In each case, the freight had not actually been paid, but the forwarder was a previously approved credit customer of the carrier's—thus, the carrier was in essence extending credit to the forwarder. The carrier, not the shipper, bore the risk of the forwarder's nonpayment.

By contrast, NSL did not release the bills of lading to COSA or accept any promise of payment in lieu of an actual payment. COSA was not an approved credit customer; instead, NSL was relying on its possession of the goods and the bills of lading to obtain payment. Nor did Johnson Products rely detrimentally—as the shippers in the cited cases did—on the presence of the words "freight prepaid" on the bills of lading. Indeed, Johnson Products had already made payment upon the freight by the time that NSL issued its first bills of lading. NSL did everything it was obliged to do in carrying plaintiffs' cargo, and having done so it had the right to exercise a valid maritime lien.

The plaintiffs argue that NSL assumed some of the risk of COSA's bankruptcy by looking solely to COSA for payment, and by failing to attempt to ascertain the identity of the original shipper for direct payment of the ocean freight. Plaintiffs thus also claim that NSL, pursuant to an obligation to try to contact the ultimate shipper, is partially to blame for the expenses incurred while the cargo was held by LAN-SAL. These arguments are without merit. As NSL points out, it held the bills of lading and the goods, and assumed—with good reason—that the shipper of a load as large as this one would itself take steps to secure the release of its cargo. Nothing in the maritime law imposed a duty upon NSL to protect Johnson Products from the consequences of its own negligence.

In sum, the plaintiffs are entitled to recover damages from ICS in the amount of $111,000, with interest calculated from April 2, 1984. The complaint is dismissed as to NSL. Plaintiffs' claims are denied in all other respects. This opinion constitutes the court's findings pursuant to Fed.R. Civ.P. 52(a).